WRATHER *v.* STATE.

(*Nashville,* December Term, 1942.)

Opinion filed April 3, 1943.

ALBERT WILLIAMS, JOE BROWN CUMMINGS, and PHILIP M. HOWSE, JR., all of Nashville, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General for the State.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Plaintiff in error appeals from a conviction of murder by poison of her son, Enoch B. Wrather, Jr., twenty-four years of age, with a prison sentence of ninety-nine years. It is conceded that the deceased died from arsenic poisoning. The question presented is whether or not the jury was justified in finding that the poison was administered feloniously and if so by his mother, a woman forty-nine years of age, in whose home and that of his father the deceased resided and where he died on the 6th day of September, 1939. A theory apparently suggested is that his poisoning was an accident, resulting incidentally from the use of arsenic by him in spraying, or some like treatment of shrubs, trees or plants on the premises which it appears had been his custom.

The evidence of the guilt of Mrs. Wrather relied on by the State is altogether circumstantial, and the earnest insistence is made that this evidence fails to sustain the verdict under the well settled rule applicable to cases of purely circumstantial evidence, that the proof must not only be consistent with and point to the guilt of the accused, but must be inconsistent with any reasonable hypothesis of innocence. Also, it is insisted that no adequate motive, of special importance in cases of circumstantial evidence, is shown.

Another insistence is that the *corpus delicti* was not established, there being no satisfactory proof that the death was brought about by a criminal agency.

By other assignments it is urged that prejudicial errors were committed in the admission of testimony, the examination of witnesses, the argument of prosecuting counsel, and in the charge of the Court.

The Wrather family, consisting of the father, mother and son, resided at the time of the death of the son, Enoch, Jr., on the Murfreesboro Road, a few miles south of Nashville, on a small farm owned by the father of the deceased. Mr. Wrather, Senior, had been engaged in the mattress business in Nashville for many years and his wife had been associated with him in the conduct of this business, being a woman of good business education and training. She seems to have looked after the correspondence and accounting, etc., for which she received a salary of $12.50 per week, while he devoted himself to the manufacturing department of the business. They appear to have been in good financial circumstances. The deceased had worked for some time with an undertaking firm, later with a chemical company, and at this time was working on his father's small farm and being paid $1 per day and his board. He does not appear to have been a financial burden on them and so far as the record shows had given them no trouble and the family relations altogether were harmonious and agreeable. Indeed, the record is replete with testimony to the devotion of both parents to this only son, and particularly the affection existing between the mother and son. Mr. Wrather testified that the son commonly addressed and spoke of his mother as "Mother-dear," and that she called him "darling" and used other pet terms. He says that she

was accustomed to furnish her son ''spending money'' from her meager earnings.

The deceased first showed signs of the illness which culminated in his death two months later, on the evening of July 6th. He left his home about 5:00 P. M. in a car. His father and mother had spent that day, as usual, at their work in town, and met and passed him on his way into the City about 5:30. A little later, about 7:30, he appeared at the home of a young lady friend, Miss Mary Katherine Moats, to whom he was attached and paying attention. He took her and lady members of her family for a drive, and later he and Miss Moats drove together out Harding Road. She says they purchased and each ate an ice cream cone. Not long after he was seized with violent pains and was forced to vomit. They returned to her home and he was so much affected that she induced him to spend the night. She says she heard him giving signs of distress during the night. About five o'clock he left for his home, where his father says he arrived about six and on alighting from the car vomited and seemed in pain. This was Friday, July 7th. He was given home remedies and got temporary relief and his parents went to their work, calling up to ask about him during the day. Continuing to have recurrences of the sick spells, Dr. A. C. Dickson was called in. He attended the young man, making six or seven calls in the next ten days. He says he discussed with Mrs. Wrather the possibility of her son having taken something on account of some girl friend, suspecting some ·character of poison. He also says he inquired if there was any possibility of his having been working about poison, although he does not seem to have suspected or suggested arsenic. He says he obtained a history of the case when he first saw the young man, who told him

that he had eaten a meat sandwich in town the night before. The deceased seems to have made this statement on one or two other occasions to other physicians. We think the deduction is reasonable that he probably ate a sandwich before he saw Miss Moats on that evening, as it does not appear that he had taken a meal at home before coming to town. On or about the 19th of July, Dr. Dickson went on a vacation. He says that at that time the young man seemed to be somewhat better of his vomiting and diarrhea. However, he had begun to give indications of trouble with his hands and feet, in the nature of paralysis, having difficulty in making use of them. This trouble later developed so that he was unable to walk alone and could not at times feed himself. Dr. Dickson suggested to the family that if he did not improve in this regard, another physician should be consulted. This was on Wednesday. Disturbed about his condition in his extremities, on Friday, the 21st, Mrs. Wrather went to the office in the City of Dr. R. N. Herbert, who had been the physician of Mr. Wrather and for whom he expressed preference. After she had explained to Dr. Herbert her son's condition, he suggested that he be brought to his office for an examination, and the next morning, Saturday, Mrs. Wrather carried her son to Dr. Herbert's office, who, after making some examination and obtaining a history of the case, recommended that he be taken to the St. Thomas Hospital for a check up. This was done, and one or two other physicians were brought into consultation. His trouble was diagnosed as poly-neuritis. Dr. Herbert found him 75 per cent depleted physically, with very little control of his limbs, etc. Dr. Herbert, in his testimony, introduced the report or statement made at the hospital written by Dr. Patterson, connected with St. Thomas, reading as

follows: 'No history of penile lesion, no tobacco, and alcohol in moderation. Gonorrhea two years ago, and for the past two weeks has had difficulty in starting stream. No headache, no vomiting, except gives history twelve days ago that he was seized with a vomiting spell in New York while drinking gin and could not eat anything for ten days." Dr. Herbert was asked about the statements in this report and he said that the young man had told him that he had been seized with a vomiting spell in New York. There is no explanation in the record of this evident mistake, as the proof shows that he had not been in New York. Dr. Herbert stated that he had examined his urine for sugar, albumen, blood, pus and cast, and found it negative.

The next afternoon, which was Sunday, the young man was discharged from the hospital and drove with Miss Moats to the home of an aunt, a Mrs. Reynolds, sister of his father, whose home was in the City, and there he spent the following week. Neither his father nor his mother saw him during this week, although it appears that both communicated with him from time to time by telephone. Miss Moats visited him for an hour or two several of the evenings and testifies that she did not observe any evidence of vomiting or diarrhea. However, being disturbed about the condition of his limbs, she arranged with a Dr. Sikes, a physician she knew, who called in Dr. McKinney, to examine the young man. They appear to have reached no very definite conclusion, but expressed the view that he was suffering from what they termed multi-neuritis, a lack of nutrition, and called up Dr. Herbert and reported to him, having understood that he was the physician in charge of the case. They recommended that he be taken back to the hospital and thereupon he was taken again to Dr. Herbert, who sent

him back to St. Thomas Hospital which he re-entered about August 1st, and where he remained until the 13th of August, which was Sunday. On that day he was taken in an ambulance to his home and was carried on a stretcher to his room and bed. He was at home from that time until his death on the 6th of September, a little more than three weeks later. During this period, he appears to have grown progressively worse. He had less and less use of his limbs and continued to have from time to time nausea, vomiting and diarrhea in varying degrees of severity. Some days he seems to have been practically free from this trouble and at other times he would have rather severe attacks. For a time his meals were prepared by different women employed on the premises, his mother continuing to go in every day with his father to the mattress factory. About ten days before his death, Mrs. Wrather gave up her work in town and from that time on until the death of Enoch, Jr., remained at home and devoted her time to looking after his diet, herself preparing many of his meals and waiting on him. Toward the last a practical nurse was employed who was in his room almost constantly night and day. He was visited by Dr. Herbert frequently and by Dr. Gilbert on September 3rd and Dr. Dickson September 4th. None of the various physicians, Dickson, Herbert, Sikes, McKinney, Gilbert or Patterson, ever suggested, or apparently suspected, the young man was suffering from arsenic poisoning, until Dr. Herbert discovered some rash on his body a few days before he died. He did not mention it, but on Wednesday morning, the day he died, Dr. Herbert obtained a small sample of his urine which he later had analyzed and found to contain arsenic.

As already stated, counsel for Mrs. Wrather frankly concede that the young man died from arsenic poisoning,

but insist that there is no evidence in this record as to how the arsenic entered his system, or from what source, or whether taken, or administered, designedly or by accident; that this grave charge made by the State rests on suspicion merely.

We find no attack made on the character of Mrs. Wrather, other than indirectly by contradiction of her testimony in what appears to us to be irrelevant or largely immaterial details, such as, for example, her interest in spiritualism, which she denied, and to which the State devotes much time and space, or her faith in dreams, or fortune tellers, or gossip with her hair dresser. On the other hand, her character is sustained by a number of unimpeached witnesses who had known her for years. And the record shows her to have been throughout her long married life a faithful, hard working wife and mother, never accused or suspected until after the death of her son of any misconduct, or wrong doing.

In a memorandum opinion we have fully discussed the various circumstances which we conceive to be relied on by the State to support the conviction. These include (1) opportunity which this mother had, by reason of being with her son; (2) that she sought this opportunity; (3) that her opportunity was at times exclusive; (4) that when away from his mother and home he was better; (5) her lack of showing of emotion and grief; (6) her conduct when the disclosure of arsenic poisoning was made; (7) that she failed to call in physicians when needed; (8) her reluctance to send him to the hospital the third time, over the son's protest; (9) that she had either one of two motives—to collect a small sum, $2,000, of life isurance, or to prevent his marriage; (10) that she predicted, or expressed apprehension, of her son's death; (11) that examination of the body indicated small and

repeated doses of poison, rather than a chronic condition, thus pointing to steady administration over a long period; (12) her alleged interest in dreams, fortune telling and spiritualism, which she denied, the relevancy of which is not apparent. We have carefully examined the testimony bearing on these circumstances, and have failed to find substantial evidence to support the charge. There is no testimony that she was even seen to administer to her son any poison, or questionable food or drug. No conduct of hers excited suspicion at the time in the mind of any one, it being frankly conceded by the witnesses that not until after the death of the young man did any person suspect her of committing or attempting to commit this crime.

In this opinion for publication we have incorporated the foregoing general statement of the facts, in such detail only as is deemed necessary to afford a background for understanding of our discussion and disposition of the determinative question of the admissibility of testimony which doubtless weighed most with the jury and without which no conviction would have been had, or could stand.

 Over the vigorous objection of defense counsel, evidence was admitted of two independent crimes, alleged to have been committed by the defendant, the murder by arsenic poisoning of the father-in-law, A. J. Wrather, and the brother-in-law Richard, of Mrs. Wrather, the first one three and the second about one year before the death of the deceased. It was testified that following the discovery of arsenic in the body of Enoch, Jr., examined shortly after burial, the remains of these men were examined and found to contain traces of arsenic. The general rule precluding evidence of previous independent crimes was invoked. This rule is

said to rest upon two grounds: "First, the impropriety of inferring from the commission of one crime that the defendant is guilty of another; and, second, the constitutional objection to compelling a defendant to meet charges of which the indictment gives no information." *State* v. *Hyde,* 234 Mo. 200, at page 225, 136 S. W., 316, at page 322, Ann. Cas., 1912D, 191, citing *People* v. *Shea,* 147 N. Y., 78, 41 N. E., 505.; *Commonwealth* v. *Jackson,* 132 Mass., 16; *State* v. *Goetz,* 34 Mo. 85. The reason for this general rule of rejection, as well stated by Mr. Underhill, is "that persons selected as jurors will very naturally believe that a person is guilty of the crime with which he is charged if it is proved to their satisfaction that he has committed a similar .offense, or any offense of an equally heinous character; and it cannot be said with truth that this tendency is wholly without reason or justification, as every person can bear testimony from his or her experience, that a man who will commit one crime is very likely subsequently to commit another of the same description. To guard against this evil, and at the same time to avoid the delay which would be incident to an indefinite multiplication of issues, the general rule (to which, however, some very important exceptions may be noted) forbids the introduction of evidence which will show, or tend to show, that the accused has committed any crime wholly independent of that offense for which he is on trial." Underhill, Crim. Ev., Sec. 87. Among the exceptions recognized to this general rule are when the evidence is introduced to prove identity, knowledge as reflecting an intent, plan or system, a course of conduct, or, of course, when part of the *res gestae.*

It was insisted that the facts in the instant case did not bring this evidence within either of the recognized ex-

ceptions to this rule. In *Warren* v. *State,* 178 Tenn., 157, 156 S. W. (2d), 416, and other cases, admission of such evidence for the purpose of proving identity is recognized as one of these exceptions, and if the testimony was admissible at all, we think it may be related to this exception. The theory of the State is that all three of these men were feloniously poisoned with arsenic and died under similar circumstances in the same home and while attended by the identical person here accused. If the facts proven establish this, the evidence certainly tends to identify the person shown to have poisoned the two former victims, under identical circumstances, as the same person guilty of the offense for which she is on trial. But this statement presupposes that (1) the former crimes were committed and that (2) the person on trial was guilty thereof. It is vigorously urged for the defense that these are essential requisites of the rule of admissibility of evidence of former crimes and that they are not complied with; that as to neither of the two former alleged offenses was death by arsenic poisoning proven, nor the guilt of the defendant thereof.

This phase of this rule of evidence does not appear to have been discussed in any reported Tennessee case. It is thus stated in 20 Am. Jur., at page 299: "The Courts generally require that evidence of the accused's guilt of another crime shall not be admitted unless the proof of the other crime is clear and sufficient to authorize a finding of the defendant's guilt of such other crime; in other words, its commission must be shown beyond a reasonable doubt." The text cites *Haley* v. *State,* 84 Tex. Cr. R., 629, 209 S. W., 675, 3 A. L. R., 779; *Pelton* v. *State,* 60 Tex. Cr. R., 412, 132 S. W., 480, Ann. Cas., 1912C, 86; and annotations in 3 A. L. R., 784. The text cites *State* v. *Hyde,* 234 Mo. 200, 136 S. W., 316, Ann.

Cas., 1912D, 191, for the holding that to be admissible such prior facts need not be established by such weight of evidence as "will amount to demonstration and shut out all doubt or question of its existence." We quote from the opinion in *Haley* v. *State, supra* [84 Tex. Cr. R., 629, 209 S. W., 677, 3 A. L. R., 779] :

"If it be assumed that the facts of this case bring it within one of the exceptions to which we will hereafter refer, it is clear that the due administration of justice demands that evidence tending to show appellant's guilt of another crime should not be admitted, unless the proof of the other offense is clear. In this case, if it is proper for the State to use the alleged fact that appellant poisoned his wife as a circumstance connecting him with the assassination of Williams, it should be shown beyond a reasonable doubt that his wife died from poison knowingly administered by him with intent to destroy her. Applying this principle to the case in hand, we find no satisfactory evidence that the appellant's wife died from poisoning.

" 'In a case of . . . poisoning, whether the symptoms and appearance during the last illness become controlling facts in determining whether the death was from poison or from disease, the charge is not made out unless the prosecution negative everything but poison as the cause of death. And this they can only do by showing affirmatively that the combined symptoms, and the absolutely certain facts with which they are associated, are inconsistent with any other disease or ailment.' *People* v. *Millard,* 53 Mich., 63, 18 N. W., 562; Whart. Crim. Ev., vol. 1, p. 162." (The immediately foregoing paragraph has direct bearing on the State's proof of the independent crimes, as will be seen hereinafter.)

In the annotation in 3 A. L. R., at page 784, other cases are cited, among them *Baxter* v. *State,* 91 Ohio St., 167, 110 N. E., 456, 458, holding that "vague and uncertain evidence" of the commission of a previous offense "should never be admitted under any pretense whatever."

■ Without going so far as to hold, with some of the Courts, that the proof of the independent crime must be "beyond a reasonable doubt," we approve the rule that, to render evidence of an independent crime admissible, the proof of its commission, and of the connection of the accused on trial therewith, must be not "vague and uncertain," but clear and convincing. Obviously, an absolute essential is that (1) a former crime has been committed, and (2) committed by the identical person on trial. Only thus can identification, or other proof of guilt, of the accused in the pending case be aided by evidence of the independent crime. And this limitation upon admissibility applies equally to all the exceptions to the general rule excluding evidence of other crimes, whether introduced to prove identity, or for any other purpose.

■ In the instant case, giving application to the foregoing rule, we do not find that commission of these two alleged independent crimes was proven. Mrs. Wrather had never been accused, must less convicted, of these alleged former crimes and was not and could not be tried therefor under the instant indictment. The evidence (1) that these deaths resulted from arsenic poisoning and (2) that Mrs. Wrather administered poison to these men is neither "clear" nor "convincing." It may well be characterized as "vague and uncertain."

While the medical testimony is that traces of arsenic were found in and about these remains, the source of it is

not clearly established. The possibility that it was injected after death is not excluded. The embalmer disclaims an intentional use of fluids containing any arsenic ingredient, but he did not manufacture or analyze what he used and it appears herein, and is common knowledge, that arsenic is sometimes used in embalming preparations to some degree. And the testimony of the chemist witness that he found some of the arsenic he discovered in and about the bodies in the wood and soil submitted to him has some significance. He testified that, "arsenic is found generally in soils, not a great lot, but it is liable to occur. It is not such a rare element. You might find it most anywhere." Does not this inject the reasonable possibility that the traces of arsenic found in and around these decomposed remains had this origin?

It is true that Dr. Core, in answer to a hypothetical question, expressed the opinion that A. J. and Richard Wrather died of arsenic poisoning, but the question assumed, not only that (1) arsenic was found in the bodies, but that (2) the deceased had before death "had symptoms of arsenic poisoning." The question asked Dr. Core read: "Assuming that this individual whose body you examined out there, shortly before death, had suffered from nausea, vomiting, diarrhea, taken further with what you found in your chemical analysis, assuming that he had symptoms of arsenic poisoning prior to his death, what in your poinion was the cause of his death?"

What has been said above suggests reasonable doubt as to the source of the poison found. We have examined the testimony relied on to evidence "symptoms of arsenic poisoning" exhibited before death.

A. J. Wrather was eighty-one or eighty-two when he died. He was brought to the Wrather home shortly before he died. He was then ill and feeble. He grew worse

and a few days before he died Mrs. Wrather quit her work in town to look after him. Mr. Wrather does not remember of his having vomiting spells and Augusta Epperson, the cook at that time, who says she prepared his meals and helped wait on him, says he had some diarrhea, but no vomiting. This is also Mrs. Wrather's testimony. Mr. Robert Wrather alone testifies that he ever vomited. The testimony is substantially the same as to Richard Wrather, except that he had lived at this home for some time. The physicians who attended these men were not called, Doctors Bradford and Law, respectively, but it is stipulated that they certified the cause of death, in both cases, to have been chronic miocarditis. Louella Cross, a State's witness, was working there when Richard died. She says Mrs. Wrather quit work three days before he died and assisted in attending him; that she recalls no vomiting. Mrs. Wrather says he had a bad case of hemorrhoids and diarrhea before death, but no vomiting. Moreover, vomiting and, or, diarrhea are too common to be classed as "symptoms of arsenic poisoning," without more or other indications thereof.

It thus appears that the evidence does not establish that either A. J. or Richard suffered from "nausea," or "vomiting," as stated in the hypothetical question put to Dr. Core. None of the other "symptoms of arsenic poisoning" generally recognized by medical authorities appeared in either case, such as rash, cramping, loss of weight, paralysis of the extremities, etc. It is, therefore, apparent that the answer of Dr. Core is without legitimate probative value.

It should be added that all witnesses agree that the relations between Mrs. Wrather and both A. J. and Richard were kindly and friendly. They paid board and she never objected to their presence, but to the contrary. There

was never any sign of friction or disagreement between them.

We are convinced that reversible error was committed in admitting the foregoing evidence of independent crimes, neither the commission nor the author of which was proven, to be considered by the jury. That it was error there can be no doubt, as heretofore shown, and that it is reversible error results from the conclusion we have hereinbefore announced, upon our review of all other evidence adduced, that without this evidence of these independent crimes the verdict is without substantial support. It becomes unnecessary to discuss here other alleged errors in the conduct of the trial. On the ground stated the judgment must be reversed and the case remanded.