STATE of Tennessee, Appellee,

v.

Sedley ALLEY, Appellant.

Supreme Court of Tennessee,
at Jackson.

Aug. 7, 1989.

W. Mark Ward, Memphis, for appellant.

**508**

W.J. Michael Cody, Atty. Gen. & Reporter, Norma Crippen Ballard, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

FONES, Justice.

This is a direct appeal of a death penalty case. Defendant was convicted of premeditated first degree murder, kidnapping and aggravated rape. The jury found two aggravating circumstances, the murder was especially heinous, atrocious or cruel and the murder was committed during kidnapping and rape, and sentenced him to death. He was sentenced to 40 years on each of the other offenses, all sentences consecutive.

The victim was Suzanne Marie Collins, age 19, a lance corporal in the U.S. Marine Corps stationed at the Millington Naval Base, while she was pursuing courses in avionics. She was described by her roommate as a friendly, happy, outgoing person, always ready to help others with their problems. In the Marines, she was, "on the honor desk", which required the achievement of high standards, academically and otherwise and that, "you be a real motivated, squared-away Marine."

At approximately 10:00 p.m. on 11 July 1985 she left her barracks dressed in physical training gear, a red Marine T-shirt, red Marine shorts, white socks and tennis shoes and went jogging on the Base, north of Navy Road. Her roommate indicated that the victim had been too busy that day to work out at the gym, which was closed at that time of night. Her body was found the next morning in Orgill Park, which adjoins the Naval Base, north of Navy Road.

Defendant was not in the military service but was married to a military person and they lived on the Naval Base. He was employed by a Millington heating and air conditioning company. He was almost 30 years old, had two children, born of an earlier marriage, living in Kentucky, and had a history of alcohol and substance abuse. After appropriate *Miranda* warnings defendant waived the presence of an attorney and gave a lengthy statement of his activities that resulted in the death of Suzanne Collins to officers of the Naval Investigating Service on the morning of 12 July 1985. The statement was tape recorded with defendant's permission. A narrative account of the relevant events of that evening as he related them to the Naval officers follows.

About 7:00 p.m. on 11 July 1985, his wife left with two women to go to a Tupperware party. Defendant had been drinking beer before they left and by approximately 9:00 p.m. he had consumed an additional six-pack and a fifth of wine. At that time he drove his 1972 Mercury station wagon, with a Kentucky license tag to the Mini Mart and purchased another six-pack. He was depressed, lonely and unhappy. He had no friends "of his own" here. He missed his two children, his mother and father, all Kentucky residents. He was torn between going to Kentucky, staying where he was, or driving the car into a wall to kill himself. He drove to the north side of the Base, parked on a lot near the golf course and started running toward Navy Lake. He ran past a girl jogging and before he got to the lake he stopped, she caught up with him and they had a brief conversation. He did not know her name and had never seen her before. They turned around and jogged back to his car. He stopped there out of breath, and she continued on toward the gate at Navy Road. He started driving down the road toward that gate in spite of his apparent recognition that he was drunk and weaving from side to side on the roadway. Parenthetically, the asphalt road in that vicinity has narrow lanes, no curb, the grass covered shoulders and nearby terrain are approximately level with the roadway. He heard a thump and realized he had struck the girl jogger. Quoting from his statement, "she rolled around and screamed a. couple of times and I ran over and grabbed her and told her I was going to take her to the hospital. I helped her into the car and we started towards...."

On the way to the hospital defendant said that she called him names such as a drunken bastard and threatened to get him

in trouble and he tried to calm her down, without success. When he reached the traffic light on Navy Road near the 7/11 store he turned left and again went to the north part of the Base in the vicinity of the lake. He described in considerable detail the subsequent events, that included hitting her a few times, holding her down on the ground, and sticking a screwdriver in the side of her head,[1] under circumstances apparently calculated by defendant to appear to be accidental. All of these actions were because she would not listen to his pleas not to turn him in.

He insisted that he did not have sex with her at any time, nor did he even try at any time. He insisted that he was scared of the trouble she was threatening him with and was drunk and could not think clearly. After sticking the screwdriver in her head and her collapse, he decided to make it appear that she had been raped. He took off her clothes, and dragged her by the feet over near a tree. There he broke off a tree limb, inserted it in her vagina and "pushed it in." He then ran to the car and drove away.

The State called numerous witnesses who observed some of the movements of defendant and victim that night.

A Naval officer driving north toward the lake on the Base passed two male Marines jogging north, and later saw a female Marine in red T-shirt and red shorts also jogging north. After passing the lone Marine he saw a white male near an old station wagon with wood paneling that was parked on an empty lot near the buffalo pens. The two Marines testified that as they jogged north a female Marine was jogging south and shortly thereafter they encountered a station wagon with wood grain paneling also going south that swerved over into the north lane towards them. The car continued on southward and when they were several hundred yards further north they heard a female voice screaming in distress, "Don't touch me", "Leave me alone." They immediately turned around and ran south in the direction of the scream. It was too dark to see any activity very far ahead and before they reached the scene they saw the station wagon drive off toward the main gate. At that time they were about 100 yards away and were able to observe that the station wagon was off the road in the grass, near the fence, on the left or wrong side for a vehicle going south. Suspecting a kidnapping they continued on to the gate and gave a full report of what they had witnessed. They accompanied military security personnel on a tour of the residential areas of the Base looking for the station wagon, without success. However, after they returned to their barracks, they were summoned to the security offices where they identified the station wagon. Defendant had been stopped and brought in for questioning as had his wife. Their responses had allayed any suspicion that defendant had been connected with a kidnapping and they were allowed to go home. All of these events occurred before approximately 1:00 a.m., 12 July 1985. The victim's body was found shortly before 6:00 a.m. on that date and defendant was promptly arrested by the military police.

After completing the statement, defendant voluntarily accompanied officers over the route he had taken the night before and to the location of the murder and accurately identified various things, including the tree where he had left the body and where it was found by others and from which the limb he used had been broken.

The pathologist, Dr. James Bell, testified that the cause of death was multiple injuries. He also identified several specific injuries, each of which could have been fatal. The victim had bruises and abrasions over her entire body, front and back. He testified that the injuries to the skull could have been inflicted by the rounded end of defendant's screwdriver that was found near the scene, but not by the pointed end. He identified the tree branch that was inserted into the victim's body. It measured 31 inches in length and had been

1. The forensic pathologist testified that she did not have an injury to her head inflicted in the manner or means described by defendant, nor did she have any injuries that could have been caused by being struck by an automobile.

inserted into the body more than once, to a depth of twenty inches, causing severe internal injuries and hemorrhaging. The pathologist was of the opinion that the victim was alive when the tree limb was inserted into her body. There were also bruises on the victim's neck consistent with strangulation.

The first and most serious issue presented by defendant in this Court is his contention that the evidence was insufficient to establish his sanity beyond a reasonable doubt.

Defendant presented sufficient evidence through the testimony of a psychiatrist, a clinical psychologist and staff persons at Middle Tennessee Mental Health Institute (MTMHI) to raise the issue of his sanity and shift the burden to the State to prove beyond a reasonable doubt that he was able to appreciate the wrongfulness of his conduct and had the capacity to conform his conduct to the requirements of the law. *See State v. Clayton*, 656 S.W.2d 344 (Tenn.1983).

Dr. Wyatt Nichols, a clinical psychologist, testified that he examined defendant on 7 November 1985 and was unable to form an opinion as to appellant's sanity at the time of the offense because defendant had amnesia and was unable to recall the events of that evening. He referred defendant to Dr. Allen Battle when he learned that a multiple personality disorder was suspected, as he did not have experience or expertise in that area.

Dr. Willis Marshall and Dr. Battle diagnosed defendant as suffering from a multiple personality disorder. Dr. Marshall testified that he was the only psychiatrist on the evaluation team that examined defendant at MTMHI during the period defendant was at that facility, 21 April to 25 July 1986. In order to see the patient at a time when another personality had taken over, defendant was interviewed under the influence of sodium amytal and under hypnosis. Dr. Marshall testified that in his opinion a personality other than "Sedley" was revealed in those sessions. He was of the opinion that defendant had one alternate personality, and possibly two. Defendant's

other personalities were referred to as "Power" or "Death", and "Billie." Dr. Marshall testified that if either of those personalities had been in control at the time of the offense, defendant or "Sedley" could neither appreciate the wrongfulness of his conduct nor conform his conduct to the requirements of the law. However, he was unable to say that a personality other than "Sedley" was in control at the time of the offense. Dr. Marshall admitted on cross-examination that he had no special expertise in the area of multiple personality disorders and had never personally observed an alternate personality. Dr. Marshall admitted that defendant's detailed confession on the day following the murder was inconsistent with defendant's later claim of loss of memory and multiple personality disorder at the time of the offense. But, he was of the opinion that there might be communication from one personality to another, one of the several areas of disagreement in the testimony of experts. Dr. Marshall did not believe that defendant had been malingering.

Dr. Allen Battle testified that he had treated more than a dozen cases of multiple personality disorders. He hypnotized defendant on three occasions and diagnosed defendant as suffering from a multiple personality disorder and he was also convinced that defendant was not faking his condition. While he was of the opinion that he had that condition in July 1985, he had no opinion as to whether an alternate personality was in control at the time of the offense.

Defendant's older sister testified that she received a strange telephone call from him during which his voice changed and "Billie" and "Power" spoke. A psychiatric social worker at MTMHI confirmed the voice change during the call to his sister and told of an occasion when defendant brought her some poems and drawings that he claimed were the work of another personality.

The State's witness, Dr. Sam Craddock, a clinical psychologist at MTMHI, testified that he administered psychological tests to defendant on 15 May 1986. He interpreted

the tests as justifying the opinion that defendant was exaggerating and malingering. He noted that defendant had no history prior to the murder, of mental health treatment and was of the opinion that it was improbable that a condition of insanity had taken control of his actions on the evening of the murder. He reviewed the videotaped sessions during which defendant was under hypnosis and continued to be of the opinion that defendant was able to appreciate the wrongfulness of his conduct and conform his conduct to the requirements of the law. His diagnosis was borderline personality disorder with a chronic history of drug and alcohol abuse. He found no evidence of multiple personality disorder or psychosis.

Dr. Zillur Athar, a forensic psychiatrist in private practice, saw defendant at MTMHI as a member of a treatment team, consisting of a psychiatrist, a psychologist, a social worker and a nurse. He testified that multiple personality disorder is a very rare condition, that usually manifests itself in late adolescence and, according to the literature, 90 percent of the persons diagnosed as having that affliction are females. He had only seen three persons with that condition, all of whom were females. He described multiple personality disorder as a condition where the physical body belonged to two or more distinct, well-integrated personalities, each with a separate set of memories that the other is completely unaware of, a total amnesia about the other personalities. He was of the opinion that defendant was a malingerer with a borderline personality disorder. He testified that defendant's actions and descriptions of the personality "Death" or "Power" does not fit the multiple personality definition, nor was he psychotic. Dr. Athar had studied the tapes of two hypnotic interviews of defendant and testified that he saw nothing to indicate to him that there was a personality separate from "Sedley."

Two other members of the evaluation and treatment team at MTMHI reached similar conclusions to those of Dr. Craddock and Dr. Athar. Dr. William Brooks, a psychiatrist, and Dr. Lynne Zager, a clinical psychologist, both of whom had examined defendant at the Midtown Mental Health Institute in Memphis, testifying for the State, found no evidence of multiple personality or psychosis or any condition that would support an insanity defense. Their diagnosis was borderline personality disorder, mixed substance abuse and malingering. Dr. Ray Gentry, a clinical psychologist, gave similar testimony.

There was a great deal of lay testimony of significance on the issue of defendant's sanity. His behavior when he was in custody around midnight on 11 July, was described as normal and his responses to questioning about a possible kidnapping as reported by the two Marines was so coherent and believable he was not detained. There was testimony that he engaged in bizarre behavior just before he knew he was to meet with the team of mental health professionals to evaluate him. The expert testimony that defendant was not insane under the standard of *Graham v. State,* 547 S.W.2d 531 (Tenn.1977), was strong and impressive and this Court is satisfied that the State proved defendant's sanity at the time of the offense, beyond a reasonable doubt and in full compliance with the mandates of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and Tenn.R.App.P. 13(e).

■■■ Defendant contends that the trial judge erred in allowing the introduction of evidence of the character, accomplishments, etc. of the victim and members of her family. The testimony objected to was that of the victim's father, John Collins. Mr. Collins testified that he was retired after 21 years in the U.S. Foreign Service, Department of State, had served in Greece, Syria, Sweden, Japan, Korea and the Philippines. He testified that his son was an honor student at the University of Virginia, that Suzanne's career objective was to be selected from the fleet for Annapolis and to fly jet planes. He described her sports and church activities and her work with handicapped children. She was described as "completely open", generous with her time, "giving" and "a genius for making friends." His testimony included statements about the family's final Christmas

holiday together, their last phone call to Suzanne and their decision to have a closed casket funeral. Defendant's counsel made a timely objection that was overruled when the State represented to the trial judge that the defendant would show through his statement that the victim, "wrongly got in the car" and that one of the defenses to the offense of rape and kidnapping would be consent. The prosecution insisted that they were entitled to show the victim's character was inconsistent with consent. This Court has several problems with the State's position on this issue. First, as we read defendant's statement it would not factually support the defense of consent to either rape or kidnapping. Second, it was certain at the time of John Collins' testimony that defendant's principal defense was insanity and the additional defense of consent would have been ill-advised if not inconsistent. Third, John Collins' testimony went beyond merely giving the jury insight into Suzanne's character, and specifically included the effect of the crime on the family.

Defendant insists that the testimony of John Collins injected an arbitrary factor into the sentencing decision in violation of the Eighth Amendment to the U.S. Constitution. He relies upon *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). A Maryland statute required that a pre-sentence investigation by the Division of Parole and Probation also include a Victim Impact Statement (VIS) describing the effect of the crime on the victim and family. At the sentencing hearing defendant Booth's motion to suppress the VIS was overruled, the prosecutor agreed to read the VIS report as prepared by an official of the Division of Parole and Probation based upon interviews of the victim's family, rather than call family members to testify in person.

The Court summarized the contents of the VIS as follows:

> The VIS in Booth's case was based on interviews with the Bronsteins' son, daughter, son-in-law, and granddaughter. Many of their comments emphasized the victims' outstanding personal qualities, and noted how deeply the Bronsteins would be missed. Other parts of the VIS described the emotional and personal problems the family members have faced as a result of the crimes. The son, for example, said that he suffers from lack of sleep and depression, and is "fearful for the first time in his life." App. 61. He said that in his opinion, his parents were "butchered like animals." *Ibid.* The daughter said she also suffers from lack of sleep, and that since the murders she has become withdrawn and distrustful. She stated that she can no longer watch violent movies or look at kitchen knives without being reminded of the murders. The daughter concluded that she could not forgive the murderer, and that such a person could "[n]ever be rehabilitated." *Id.,* at 62. Finally, the granddaughter described how the deaths had ruined the wedding of another close family member, that took place a few days after the bodies were discovered. Both the ceremony and the reception were sad affairs, and instead of leaving for her honeymoon, the bride attended the victims' funeral. The VIS also noted that the granddaughter had received counseling for several months after the incident, but eventually had stopped because she concluded that "no one could help her." *Id.,* at 63.

The DPP official who conducted the interviews concluded the VIS by writing:

> It became increasingly apparent to the writer as she talked to the family members that the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory to them that it permeates every aspect of their daily lives. It is doubtful that they will ever be able to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which their loved ones were murdered and taken from them. *Id.,* at 63–64.

107 S.Ct. at 2531–32

The Court said that the VIS provided the jury with two types of information that was irrelevant to a capital sentencing decision that created, "a constitutionally unacceptable risk that the jury may impose the

death penalty in an arbitrary and capricious manner." *Id.* at 2533.

The two types of irrelevant information were:

First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characterizations of the crimes and the defendant.

*Id.*

There are significant distinctions between *Booth* and the instant case. The VIS in *Booth* was read at the sentencing hearing. In this case, Mr. Collins testified during the guilt-innocence phase of the trial six days before the sentencing hearing began. Nothing occurred at the sentencing hearing that directly called the jury's attention to the fact that Mr. Collins' victim impact testimony was relevant to sentencing. The scope of the statement in *Booth* was more extensive and significantly more inflammatory than that of Mr. Collins. Also of the two types of information condemned in *Booth,* Mr. Collins' testimony was limited to the first type, to wit, the personal characteristics of the victim and the emotional impact of the crime on the family. His testimony did not include family members opinions and characterizations of the crimes and the defendant.

The trial judge erred in failing to sustain defendant's objection at the time it was made, but in our opinion the erroneously admitted evidence, preceding the sentencing phase of the trial by six days and although irrelevant to either phase of the trial was not inflammatory and did not create a constitutionally unacceptable risk of arbitrary or capricious imposition of the death penalty. Finally, we are of the opinion that the error did not affect the sentence and that it was harmless beyond a reasonable doubt. Defendant's guilt in this case was established at the level of absolute certainty.

Defendant also contends that the trial judge erred during voir dire in allowing the State, over defendant's objection, to question a prospective juror, Janie Hearn, as to whether her views on the death penalty would give the victim's parents, Mr. and Mrs. Collins, a fair trial. Juror Hearn did not serve as a juror and the record before us does not indicate that any other juror was asked such a question. The question asked Ms. Heard was immediately followed by the statement that, "the entire State of Tennessee has an interest that justice be done"—which was a proper reference that tended to diminish the emphasis on "justice for the victim's family." While we agree with defendant that the reference to giving the victim's parents a fair trial is irrelevant and should be avoided, particularly in a capital case, the single reference in this case falls far short of prejudicial error.

■ Next defendant contends it was error for the trial judge to allow over defendant's objection a 16–inch by 20–inch photograph of the victim at the time of her high school graduation to remain upright before the jury's view, "during the entire first day of testimony." The record in this Court reveals that no objection was voiced by defendant until the end of the first day, at which time it was overruled. On the morning of the third day of trial the court directed the State to substitute a small photograph for the 16 by 20, which apparently satisfied defendant's objection. The record does not reflect how the large photograph was displayed during the second day of trial, and this issue is without merit.

■ Defendant contends it was error to allow Deborah Richardson, a social worker, to testify about the characteristics of a multiple personality disorder, specifically that the person would have no knowledge of other personalities, cannot see other personalities outside himself, cannot have personalities that change over time and cannot have personality changes triggered by stress.

Deborah Richardson had a Master's Degree in social work and was certified by the Tennessee Board of Social Worker Certification and Licensure, to assess patients' mental status and behavior, to make diagnoses, to write social histories, to develop psycho-social assessments and to perform psychotherapy. At MTMHI she gathered

the patient's history, collected and reviewed all relevant information on a patient, kept up with the patient's daily status and presented this information to the psychiatrist and psychologist on the treatment and evaluation teams. She had been trained to distinguish data and material important in making a diagnosis of multiple personality and had worked on defendant's case. It was part of her duty in working on defendant's case to inform the psychologist and psychiatrist of her observations that were consistent or inconsistent with the characteristics of a multiple personality disorder. It was for this reason as insisted by the State that the trial judge allowed her to testify as she did and we find no error in the allowance of her testimony. Insofar as she may have encroached on the realm of the experts in stating the characteristics of a multiple personality disorder that testimony was cumulative of that given by the State's psychologist and psychiatrist, and the information she imparted was necessarily acquired from those experts she was assisting.

■ Defendant contends that Deborah Richardson should not have been allowed to testify that the bulk of the information found in the defendant's letters was, "supportive of malingering" and consistent with a borderline personality, or that the letters indicated to her that the defendant knew right from wrong. The witness read excerpts from the letters upon which she based her testimony. While her testimony about the diagnosis may have also infringed upon the realm reserved for expert testimony, in the light of the massive amount of testimony by qualified experts expressing the same opinion she had expressed and the fact that the letters themselves were read to the jury so that they could reach their own conclusions, any error was harmless beyond a reasonable doubt.

■ Defendant also complains about some of the testimony of David Hawkins. He was a psychiatric technician whose job it was to observe and document the defendant's behavior while at MTMHI. On cross-examination, over objection, Hawkins testified that he thought defendant was malingering and that he did not act like persons who were really insane. A lay person can give his opinion on the issue of sanity. *Edwards v. State*, 540 S.W.2d 641 (Tenn.1976), *cert. denied* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 777 (1977). There is no merit to this issue.

■ Defendant contends that prejudicial error was committed by the State in the manner in which it used so-called learned treatises in cross-examining Dr. Allen Battle.

Defendant acknowledges the use that may properly be made of learned treatises, to wit, to test the expert's knowledge and accuracy on the subject matter involved in the case by reading from standard authorities, asking if the witness agrees or disagrees and comparing his opinion with that of the writer of the treatise. *See McKay v. Mitchell*, 62 Tenn.App. 424, 463 S.W.2d 710, 720 (1970). Here, defendant insists that the prosecutor went beyond reading for the purpose of comparing Dr. Battle's opinions with authors and presented to the jury irrelevant and prejudicial information concerning two similar notorious cases in which the defendants had been determined to have been faking multiple personalities.

We have carefully studied the pages of the transcript that are the subject of defendant's complaint and we cannot agree that irrelevant and prejudicial information was presented to the jury. On direct examination Dr. Battle had expressed the opinion that defendant had a multiple personality disorder and that he was not faking or malingering. On cross-examination the prosecutor read from an article in the *International Journal of Experimental Hypnosis*, Vol. 32 (1984) by Corbett Thigpen, the expert in the famous case of *The Three Faces of Eve*. Dr. Battle acknowledged that he was familiar with Thigpen and the two cases discussed in the article, *State v. Milligan* (1978) and the *Bianchi Hillside Strangler* case. The prosecutor read various excerpts from the article for the purpose of determining whether Dr. Battle agreed or disagreed with conclusions expressed therein, that multiple personality disorders were rare, that there

was a tendency to ignore or underestimate "secondary gain" as a motivation for manifesting multi-personality after a person has been charged with criminal activity, and the difficulty of accurate diagnosis of multi-personality where there was no history of psychotherapy or amnesia prior to the criminal charges. Clearly, all of those concerns were legitimate areas of cross-examination and of inquiry into Dr. Battle's views as contrasted with those expressed in the Thigpen article. Dr. Battle expressed agreement with almost all of the excerpts read by the prosecutor. However, he responded to an excerpt about the *Milligan* case wherein the writer expressed the opinion that Milligan's, "deliberate manipulation resulted in a gross miscarriage of justice and denigration of psychiatry ..." with the observation that he was experienced in observing malingering and believed it would be difficult to fake multi-personality, "it would be much easier to malinger, let's say, schizophrenia ... than multiple personality."

The only portion of the excerpts from the article that could be classified as inflammatory were the quote in the preceding paragraph and an excerpt in which a psychologist who misdiagnosed the Hillside Strangler said that a person under threat of death is not bound by any rules of conduct involving honesty, decency or fair play—the only rule is to save his own skin. No objection was made nor any curative instruction sought, nor any redaction requested with respect to either. Both statements by qualified experts were relevant to the malingering issue, and in the context of the entire cross-examination and Dr. Battle's responses we find no error.

■ Defendant contends the trial judge erred in granting the State's motion in limine, to exclude the videotaped hypnotic and sodium amytal interviews from the jury's consideration. Dr. Battle testified at the hearing, out of the presence of the jury, that he was a licensed clinical psychologist and had extensive experience in the area of hypnosis; that in the area of multiple personality disorders, hypnosis is a method of choice in arriving at a diagnosis.

He testified that he performed hypnosis upon defendant in accord with well recognized principles in that field, that the sessions were videotaped, and that in his opinion viewing the tapes would be helpful to the jury because he could not explain the nature of a multiple personality disorder, "as well as could be obtained by anyone by seeing it in the flesh, so to speak." He said that viewing the tapes would aid the jury in understanding his diagnosis and he could explain to the jury the pitfalls of the use of hypnosis and that it was possible to lie under hypnosis.

Dr. William Gentry testified at the in limine hearing that there were pitfalls in the use of hypnosis and that in his opinion juries tended to give hypnotic testimony too much weight and they did not understand that a person may lie under hypnosis. He testified that hypnosis was a legitimate tool for treatment of a multiple personality but that it was often seen as magical, mystical; that it was regarded as possessing properties beyond the actual ability of the tool; that the hypnotic state produces a variety of levels of altered consciousness which must be understood from a clinical perspective and cannot be understood from a lay perspective without significant training in that area.

The trial judge viewed the tapes and found them to be sensational, the defendant to be untruthful and the tapes unreliable and granted the State's motion. Specifically, he ruled that the tapes could not be shown to the jury and the witnesses could not testify as to, "the words and actions of the defendant during the course of these interviews." He permitted the witnesses to say that interviews were conducted, however, and all of the witnesses who viewed the videos were permitted to so testify and express their opinions with respect to whether multiple personalities were revealed during the sessions. This Court has not heretofore ruled upon this issue. The general rule appears to be that audio or video tapes recording a defendant's statements and conduct while under hypnosis or truth serums, when offered as evidence of the basis of an expert's opinion as to the defendant's mental condition, may

be admitted or excluded in the exercise of the trial court's discretion after weighing the probative value of the tape as part of the basis for the expert's opinion, against the risk that the tape might confuse or mislead the jury or be improperly considered as independent proof of the facts recited and shown therein. Where the tapes are not admitted the admission of testimony of the details of what the defendant said while under hypnosis or truth serum is likewise within the trial court's discretion. *See* Annotation, Admissibility of Hypnotic Evidence, 92 A.L.R. 3d 442 § 9 (1979); *State v. Garcia*, 233 Kan. 589, 664 P.2d 1343 (1983); *Eaton v. State*, 394 A.2d 217 (Del.1978); *People v. Myers*, 35 Ill.2d 311, 220 N.E.2d 297 (1966); *People v. Modesto*, 59 Cal.2d 722, 31 Cal.Rptr. 225, 382 P.2d 33 (1963); *State v. White*, 60 Wash.2d 551, 374 P.2d 942 (1962); *People v. Diaz*, 644 P.2d 71 (Colo.App.1981); *Tripp v. State*, 36 Md.App. 459, 374 A.2d 384 (1977); *People v. Hiser*, 267 Cal.App.2d 47, 72 Cal. Rptr. 906 (1968).

Upon viewing the tapes, the validity of Dr. Gentry's testimony about the mystical quality of and sensational nature of the hypnotic state is confirmed. We are of the opinion, as was Dr. Gentry, that a jury of laymen could not understand and interpret the hypnotic tapes reliably. The experts who were most favorable to defendant, Dr. Marshall and Dr. Battle, were allowed to testify that they conducted and observed the videos with defendant under hypnosis and saw personalities other than "Sedley" that were in control. In our opinion allowing the jury to view the tapes would have confused and misled them and the trial judge properly granted the State's motion. Defendant's contention that the trial judge's ruling was in violation of *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) is incorrect. In *Rock* the court held that defendant's right to testify was violated by a per se rule excluding all of defendant's hypnotically refreshed testimony because such testimony is always unreliable. The trial judge stated that he had read the cases cited to him and the annotation at 92 A.L.R.3d 442 and he proceeded to weigh the probative value

against the prejudicial effect. *Rock* did not preclude the use of unreliability as a factor in that weighing process, only its use as a per se rule, in all circumstances.

Defendant contends the trial judge erred in refusing to allow the video tapes to be played at the sentencing hearing. Defendant says the tapes were relevant to the mitigating circumstances in T.C.A. § 39–2–203(j)(2), defendant under the influence of extreme mental and emotional disturbance, and (j)(8) substantial impairment of defendant's appreciation of the wrongfulness of his conduct or to conform his conduct to the requirements of the law as a result of a mental disease, defect or intoxication, insufficient to establish a defense to the crime. There is no evidence whatever on the tapes of defendant's mental or emotional state or his ability or lack of ability to appreciate right from wrong or control his conduct on the evening of 11 July 1985. Both of the mitigating circumstances relied upon by defendant require evidence of defendant's condition *at the time the crime was committed.* The facts that dictated the exclusion of the tapes at the guilt and innocence phase were equally applicable at the sentencing phase.

■ Defendant says the trial judge erred in admitting photographs of the victim's body, taken at the scene of the crime. The complaint of defendant focuses on the badly beaten face of the victim and the stick protruding from the victim's vaginal area. The State submitted seven photographs to be shown to the jury. The trial judge held one of them, showing body fluids oozing from the nose and mouth, inadmissible. We cannot say that the trial judge abused his discretion in admitting the other six photographs, under the principles expressed in *State v. Banks*, 564 S.W.2d 947 (Tenn.1978).

■ Defendant complains that the trial judge erred in allowing, "proof of another crime." The State proffered evidence at a jury-out hearing that during the work day of 11 July 1985 defendant had assisted his employer in installing a vacuum pump and gauges at the Admiral's house on the Navy

Base near the area where the victim was jogging. On 12 July defendant's employer returned to the Admiral's house and found the equipment missing. The pump and gauges were observed in defendant's station wagon by the officers when he was stopped on the night of 11 July. On 12 July after the body was found defendant's home was searched and the missing pump and gauges were found in a back yard shed. It was the State's position that the evidence was relevant on the issue of defendant's motive for the kidnapping and murder; that the jury could infer that defendant had parked his automobile near the Admiral's house, stolen the equipment and was observed by the victim in returning it to his car and further that he was in an area at a time and place that he denied being. We find no evidence to support the latter portion of that contention. The trial judge gave a curative instruction that the jury could consider the fact, if they so found, that the defendant had the pump and gauges in his possession but were not to consider whether he had stolen those items since he was not on trial for that offense. This evidence was properly admitted under the guidelines of *State v. Parton*, 694 S.W.2d 299 (Tenn.1985); *Bunch v. State*, 605 S.W.2d 227 (Tenn.1980); and *Wrather v. State*, 179 Tenn. 666, 169 S.W.2d 854 (1943).

■ Defendant contends that the trial judge erred in excusing prospective jurors Kenneth Todd and Leslie Jarred, for cause, and in refusing to allow defendant to voir dire said jurors. Defendant says that juror Todd stated that he had strong feelings regarding the death penalty but whether he could impose it, "depended on the crime;" that juror Jarred stated that he would spend a lot of sleepless nights over it, but he thought he could consider the death penalty.

Our reading of the record reveals that Todd stated that, "Being a part of this man killed—would bother me." He said he could not give the death penalty and that wondering whether he could, "give this guy the death penalty" would be on his mind the whole trial so that it would affect his ability to pay attention. Later he stated that under no set of circumstances would he invoke the death penalty. The exclusion of prospective juror Todd clearly conformed to the standards of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

■ Prospective juror Jarred at first indicated that he thought he could follow the law and give consideration to the death penalty but that his mind would not rest easy on a sentence of death. Later he said he would spend a lot of sleepless nights and was not sure his mind could rest easy giving the death penalty. The trial judge asked the final question of Mr. Jarred, whether he could follow the law and, "consider the death penalty, as well as the alternate punishment, which is life." Jarred's response was, "I'm not sure that I could." At that point a bench conference was held out of the hearing of the prospective jurors. After the lawyers spent several pages arguing whether or not the prospective juror's responses indicated he could follow the law and whether his mind could rest easy on giving the death penalty, the trial judge said, "Well, in viewing the juror as I sit here on the bench, he's having a very difficult time dealing with the questions." Whereupon the trial judge announced his intention to excuse Mr. Jarred for cause. Defendant objected to excusing Jarred without allowing them to voir dire him. The trial judge asked for authority that defendant was entitled to voir dire under those circumstances. When no case was forthcoming the juror was excused. Here, the State relies upon *State v. Strouth*, 620 S.W.2d 467 (Tenn.1981) to justify the trial judge's action in dismissing Jarred and denying defendant the opportunity to rehabilitate him. In *Strouth* this Court said that during the voir dire of Mrs. Penley she repeatedly and unequivocally told the trial judge she would automatically vote against the death penalty, whatever the evidence. We said, "Her statements left no leeway for rehabilitation, and left the trial judge with no alternative but to disqualify her 'for cause'." *Id.* at 471. The questioning of Mr. Jarred by the prosecution and the trial court had not reached

the point that left no leeway for rehabilitation and therefore *Strouth* is not applicable here.

The issue we must decide is whether the dismissal of Mr. Jarred for cause was appropriate under the dictates of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In that case the U.S. Supreme Court adopted the following standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment: "[w]hether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"

The Court then noted that that standard, taken from *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), dispensed with *Witherspoon*'s[2] reference to "automatic" decision-making and abandoned *Witherspoon*'s requirement that a juror's bias be proved with "unmistakable clarity."

Of particular significance to the issue under consideration here, the *Wainwright* Court held that a trial judge's determination that a prospective juror may be excluded for cause because of his views on capital punishment is a finding on a factual issue and must be accorded the presumption of correctness under 28 U.S.C. § 2254(d).

> The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the "factual issues" that are subject to § 2254(d).

105 S.Ct. at 855.

■ We are not bound to adopt the same standard of review of a trial judge's action in the circumstances under discussion, but we cannot adopt a standard that provides less protection of defendant's in capital cases. *See Leech v. American Booksellers Ass'n*, 582 S.W.2d 738, 745 (Tenn.1979). We think it appropriate to adopt the same standard of review pre-

scribed in *Wainwright*, to wit, the trial court's finding of bias of a juror because of his views of capital punishment shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that that determination was erroneous.

Applying that standard to the trial judge's ruling with respect to Mr. Jarred we conclude that defendant has failed to establish by convincing evidence that the court's action was erroneous. The questioning by the prosecuting attorney produced ambiguous results, and the trial judge's refusal to allow defendants to voir dire the prospective juror when there appears to have been "leeway for rehabilitation" are matters of grave concern to this Court in resolving this issue. However, we agree with the *Wainwright* Court that, "determinations of juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism." 105 S.Ct. at 852.

In *State v. Harrington*, 627 S.W.2d 345 (Tenn.1981) we reversed the sentence of death and remanded for a new sentencing hearing upon our finding that the trial judge had erroneously excluded a single juror for cause in violation of the *Witherspoon* standard. *Harrington* was decided four years before *Wainwright* and on the juror bias issue is no longer of precedential value.

■ The defendant, relying upon the dissent in *State v. Dicks*, 615 S.W.2d 126 (Tenn.1981), contends that the death penalty is in all circumstances unconstitutional. He adds that the evolving standards of decency in this State no longer support the infliction of the death penalty and that it does not conform with contemporary moral standards. No additional Eighth Amendment arguments are presented and we find the issue of the death penalty as appropriate punishment for first degree murder within the mandates of the U.S. Supreme Court to be purely a legislative matter.

■ Defendant asserts that prejudicial error was committed by reference to the

---

**2.** *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Bible during the State's cross examination of defendant's brother. The prosecutor said to John Alley, Sr., defendant's brother, "You would do anything you could to help your brother, wouldn't you?" The witness responded that he wouldn't lie because he was, "saved and baptized" and he was asked if he believed all the tenets of the Bible and had read the Old Testament, to which he responded affirmatively. He was then asked the following question: "Do you remember the part where it says: 'He who shall smiteth a man down so that he die shall be put to death.'" The witness said that he had heard that. Defendant did not make a contemporaneous objection and, if error, it was of such insignificance that it could not possibly have had any effect upon the sentence.

Defendant contends the prosecutor was guilty of misconduct in asking his brother if defendant had been in trouble with the law when they were living together in Ypsilanti, Michigan.

John Alley, Sr., testified at the sentencing hearing about the good character of defendant; that he had never had a problem with drugs nor engaged in heavy drinking during that period. On cross-examination he was asked what kind of trouble Sedley got into with the law in Ypsilanti. The witness said he did not recall, and was then asked, "He didn't have an assault charge up in Ypsilanti, Michigan?" The witness responded that it was kept from him if defendant did. He was then asked: "Do you remember him getting in fights up there?".

Defendant says that he raised this issue on motion for new trial and asserted that no such charges existed and the State's response did not claim any charges existed in Ypsilanti. In this Court the State does not assert that any such charges existed. Thus, the only conclusion this Court can draw is that the prosecution questioned defendant's brother about criminal charges having been brought against defendant in Ypsilanti, Michigan, knowing that no such charges existed. Such conduct is reprehensible, unprofessional and will not be tolerated by this Court, and should not be tolerated by any trial court.

The State's response to defendant's contention that this inexcusable conduct was reversible error is that defendant opened the door by testifying on direct examination about defendant's good character and good conduct in Ypsilanti. The State is mistaken. Nothing opens the door for the calculated use of questions based on false and non-existent charges. In *Delk v. State*, 590 S.W.2d 435 (Tenn.1979) we condemned the calculated use by prosecutors of questions for the purpose of planting in the minds of the jury the suggestion of the existence of damaging evidence against the defendant that except for some mysterious technicality would have been more fully adduced, when it was known that such evidence did not exist. *Id.* at 439.

Turning to the question of reversible error and applying the factors set out in *State v. Buck*, 670 S.W.2d 600 (Tenn.1984), we conclude that the error, though reprehensible, was not reversible.

We have carefully reviewed this case in accord with the requirements of T.C.A. § 39-2-205(c) and find that the sentence was not imposed in any arbitrary fashion, that the evidence supports the jury's findings of the aggravating circumstances in T.C.A. § 39-2-203(i)(5) and (i)(7), the absence of any mitigating circumstances and that the sentence of death was not disproportionate to the penalty in similar cases.

The convictions and sentences imposed in the trial court are affirmed. Unless stayed by proper authority, the sentence of death will be carried out as provided by law on the 13th day of November, 1989.

DROWOTA, C.J., and HARBISON, COOPER and O'BRIEN, JJ., concur.