IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Special Session Assigned on Briefs May 21, 2004


**SEDLEY ALLEY v. STATE OF TENNESSEE**


**Direct Appeal from the Criminal Court for Shelby County**
**No. P-8040      W. Otis Higgs, Jr., Judge**

---

**No. W2004-01204-CCA-R3-PD  - Filed May 26, 2004**

---

        In 1985, Petitioner, Sedley Alley, was convicted of the crimes of aggravated rape, kidnapping, and first degree murder. The jury fixed his punishment at death for first degree murder and the trial court imposed consecutive forty-year sentences for kidnapping and aggravated rape. Petitioner Alley filed a petition to compel testing of evidence under the Post-Conviction DNA Analysis Act of 2001. The post-conviction court denied the petition, and Petitioner Alley timely appealed. This Court expedited review of this matter. Upon review of the record and the responses by both parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Donald E. Dawson, Nashville, Tennessee for the appellant, Sedley Alley.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

        In 1985, Petitioner Sedley Alley was convicted of the kidnapping, aggravated rape and premeditated first degree murder of Suzanne Collins, a nineteen-year-old lance corporal in the United States Marine Corps. The jury found two aggravating circumstances, *i.e.*, the murder was especially heinous, atrocious, or cruel and the murder was committed during a kidnapping and rape, and sentenced Petitioner Alley to death. *See State v. Alley*, 776 S.W.2d 506, 508 (Tenn. 1989). For the two remaining convictions the trial court imposed consecutive forty -year sentences. *Id.* His convictions and sentences were affirmed on direct appeal. *Id.* Petitioner Alley later sought post-conviction relief, which was denied by the post-conviction court. *See Alley v. State*, 958 S.W.2d

138, 140 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1997). On appeal, this Court reversed, ordered the recusal of the trial judge, and remanded the case for a new hearing. *See Alley v. State*, 882 S.W.2d 810 (Tenn. Crim. App. 1994). Upon remand, the Petitioner Alley was again denied relief. *Alley*, 958 S.W.2d at 140. On appeal, this Court affirmed the lower court's denial of post-conviction relief. *Id.* In 1998, Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Western District of Tennessee. The district court summarily dismissed the petition. *See Alley v. Bell*, 101 F.Supp. 2d 588 (W.D. Tenn. 2000). The Sixth Circuit Court of Appeals affirmed the lower court's dismissal. *See Alley v. Bell*, 307 F.3d 380 (6th Cir. 2002), *reh'g denied*, (Dec. 20, 2002), *cert. denied*, 124 S. Ct. 99 (2003). Thereafter, the State of Tennessee filed a motion in the Tennessee Supreme Court requesting the setting of an execution date. On January 16, 2004, the Tennessee Supreme Court granted the State's motion, setting the execution date for June 3, 2004. *See State v. Sedley Alley*, No. M1991-00019-SC-DPE-DD (Tenn. Jan. 16, 2004) (*order*).

On May 4, 2004, Petitioner Alley filed a petition requesting post-conviction DNA analysis in the Shelby County Criminal Court. *See* Tenn. Code Ann. § 40-30-301 to -313. Following a hearing held on May 13, 2004, the post-conviction court, on May 17, 2004, denied Petitioner Alley's petition in a twenty-three page order. In denying DNA testing, the post-conviction court found that "the petitioner has failed to demonstrate that a reasonable probability exists that . . . he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis of the requested samples." The post-conviction court further found that "the petitioner has failed to demonstrate that a reasonable probability exists that analysis of said evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." From this denial, Petitioner Alley sought this Court's review pursuant to Rule 3, Tennessee Rules of Appellate Procedure. Petitioner Alley contemporaneously filed with this Court an "Emergency Motion for Production of Biological Samples for DNA Analysis" and a "Motion to Preserve Evidence for DNA Analysis." Although this Court denied both motions filed by Petitioner Alley, this Court ordered expedited review of the lower court's denial of Petitioner Alley's request for DNA analysis.

We note that in this Court's order granting expedited review of the above-captioned matter, this Court directed that "Petitioner Alley shall have until 12:00 p.m., May 19, 2004, to provide this Court with a certified copy of the post-conviction court's order denying the petition for DNA analysis and any part of the record deemed necessary for this Court's review." *See State v. Sedley Alley*, No. W2004-01204-CCA-R3-PD (Tenn. Crim. App. at Jackson, May 18, 2004) (*order*). Petitioner Alley has failed to provide this Court with any documentation of the proceedings in the lower court, including but not limited to the Petitioner's original petition, the State's response, and the transcripts of any hearing on the matter. In this regard, we note that it is the duty of the appealing party to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b). "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard,* 855 S.W.2d 557, 560 (Tenn.1993). In the absence of an adequate record on appeal, this

Court must presume that the post-conviction court's rulings are supported by sufficient evidence. *State v. Oody,* 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

## *I. The Act*

The Post-Conviction DNA Analysis Act of 2001 provides that a person convicted of certain enumerated offenses, including first degree murder, may, at any time, file a petition requesting forensic DNA analysis of any evidence (1) in the possession or control of the prosecution, law enforcement, laboratory, or court, and (2) that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence. Tenn. Code Ann. § 40-30-303. A post-conviction court is obligated to order DNA analysis when the petitioner has met each of the following four conditions:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. Additionally, if DNA analysis would have produced a more favorable verdict or sentence if the results had been available at the proceedings leading up to the conviction or sentence, then the post-conviction court may order DNA analysis when the petitioner meets the same conditions. Tenn. Code Ann. § 40-30-305. In either instance, some physical evidence must be available and in a proper condition to enable a DNA analysis. Tenn. Code Ann. § 40-30-304(2). The absence of any one of the four statutory conditions results in the dismissal of the petition. *See William D. Buford v. State*, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App. at Nashville, Apr. 24, 2003).

The post-conviction court is afforded considerable discretion in determining whether to grant a petitioner relief under the Act, and the scope of appellate review is limited. *See Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *4 (Tenn. Crim. App. at Knoxville, Dec. 16, 2003), *perm. to appeal filed,* (Tenn. Apr. 2, 2004)(citation omitted). In making its decision, the post-conviction court must consider all the available evidence, including the evidence presented at trial and any stipulations of fact made by either party. *Id.* The lower court may also consider the opinions of this court on direct appeal of the petitioner's convictions or the appeals of the petitioner's prior post-conviction or habeas corpus actions. *Id.* On appellate review, this Court will not reverse

unless the judgment of the lower court is not supported by substantial evidence. *See Willie Tom Ensley v. State*, No. M2002-01609-CCA-R3-PC, 2003 WL 1868647, at *4 (Tenn. Crim. App. at Nashville, Apr. 11, 2003).

## *II. Alley's Request*

In his petition, Petitioner Alley requested the production of eleven biological samples:

(1)  Vaginal swabs from the victim,

(2)  Swab taken from the victim's right inner thigh,

(3)  Swab taken from the victim's left inner thigh,

(4)  Nasopharyngeal swabs from the victim,

(5)  Oral swabs from the victim,

(6)  Rectal swabs from the victim,

(7)  Head hairs from an African-American individual found on the victim's socks,

(8)  A Caucasian body hair found on the victim's waistband,

(9)  A Caucasian pubic hair found on the victim's left shoe,

(10) A hair found on a stick found in the victim, and

(11)  Blood and hair samples of the victims.

Petitioner Alley argues that these samples contain biological evidence which will establish the identity of the person or persons who committed the sexual assault and murder of the victim in this case. In essence, Petitioner Alley asserts that he is not the perpetrator of these offenses despite his prior confession. He contends that "certain evidence tends to implicate one of the victim's romantic partners." Additionally, Petitioner Alley maintains that the reviewing court should disregard certain evidence at trial as unreliable; specifically, (1) his confession, as it was coerced; (2) recently discovered documents from Dr. Bell, revealing that the victim's time of death was later than originally thought; (3) the description of the perpetrator provided by Scott Lancaster does not match the Petitioner's description; (4) the description of the vehicle provided by witnesses does not match that of the Petitioner's vehicle; (5) tire tracks at the abduction scene do not match Petitioner's vehicle; (6) fingerprints on a beer bottle recovered near the victim's body are not identical to Petitioner's; and (7) shoe prints at the abduction scene do not match the shoes he was wearing on the night in question. Petitioner requests that the State be ordered to provide him with the above-mentioned items for DNA analysis.

### III. The Evidence

In its decision affirming the Petitioner's convictions and sentences for the murder of Suzanne Collins, the Tennessee Supreme Court summarized the facts as follows:

The victim was Suzanne Marie Collins, age 19, a lance corporal in the U.S. Marine Corps stationed at the Millington Naval Base, while she was pursuing courses in avionics. She was described by her roommate as a friendly, happy, outgoing person, always ready to help others with their problems. In the Marines, she was, "on the honor desk", which required the achievement of high standards, academically and otherwise and that, "you be a real motivated, squared-away Marine."

At approximately 10:00 p.m. on 11 July 1985 she left her barracks dressed in physical training gear, a red Marine T-shirt, red Marine shorts, white socks and tennis shoes and went jogging on the Base, north of Navy Road. Her roommate indicated that the victim had been too busy that day to work out at the gym, which was closed at that time of night. Her body was found the next morning in Orgill Park, which adjoins the Naval Base, north of Navy Road.

Defendant was not in the military service but was married to a military person and they lived on the Naval Base. He was employed by a Millington heating and air conditioning company. He was almost 30 years old, had two children, born of an earlier marriage, living in Kentucky, and had a history of alcohol and substance abuse. After appropriate *Miranda* warnings defendant waived the presence of an attorney and gave a lengthy statement of his activities that resulted in the death of Suzanne Collins to officers of the Naval Investigating Service on the morning of 12 July 1985. The statement was tape recorded with defendant's permission. A narrative account of the relevant events of that evening as he related them to the Naval officers follows.

About 7:00 p.m. on 11 July 1985, his wife left with two women to go to a Tupperware party. Defendant had been drinking beer before they left and by approximately 9:00 p.m. he had consumed an additional six-pack and a fifth of wine. At that time he drove his 1972 Mercury station wagon, with a Kentucky license tag to the Mini Mart and purchased another six-pack. He was depressed, lonely and unhappy. He had no friends "of his own" here. He missed his two children, his mother and father, all Kentucky residents. He was torn between going to Kentucky, staying where he was, or driving the car into a wall to kill himself. He drove to the north side of the Base, parked on a lot near the golf course and started running toward Navy Lake. He ran past a girl jogging and before he got to the lake he stopped, she caught up with him and they had a brief conversation. He did not know her name and

had never seen her before. They turned around and jogged back to his car. He stopped there out of breath, and she continued on toward the gate at Navy Road. He started driving down the road toward that gate in spite of his apparent recognition that he was drunk and weaving from side to side on the roadway. Parenthetically, the asphalt road in that vicinity has narrow lanes, no curb, the grass covered shoulders and nearby terrain are approximately level with the roadway. He heard a thump and realized he had struck the girl jogger. Quoting from his statement, "she rolled around and screamed a couple of times and I ran over and grabbed her and told her I was going to take her to the hospital. I helped her into the car and we started towards. . . ."

On the way to the hospital defendant said that she called him names such as a drunken bastard and threatened to get him in trouble and he tried to calm her down, without success. When he reached the traffic light on Navy Road near the 7/11 store he turned left and again went to the north part of the Base in the vicinity of the lake. He described in considerable detail the subsequent events, that included hitting her a few times, holding her down on the ground, and sticking a screwdriver in the side of her head, under circumstances apparently calculated by defendant to appear to be accidental. All of these actions were because she would not listen to his pleas not to turn him in.

He insisted that he did not have sex with her at any time, nor did he even try at any time. He insisted that he was scared of the trouble she was threatening him with and was drunk and could not think clearly. After sticking the screwdriver in her head and her collapse, he decided to make it appear that she had been raped. He took off her clothes, and dragged her by the feet over near a tree. There he broke off a tree limb, inserted it in her vagina and "pushed it in." He then ran to the car and drove away.

The State called numerous witnesses who observed some of the movements of defendant and victim that night.

A Naval officer driving north toward the lake on the Base passed two male Marines jogging north, and later saw a female Marine in red T-shirt and red shorts also jogging north. After passing the lone Marine he saw a white male near an old station wagon with wood paneling that was parked on an empty lot near the buffalo pens. The two Marines testified that as they jogged north a female Marine was jogging south and shortly thereafter they encountered a station wagon with wood grain paneling also going south that swerved over into the north lane towards them. The car continued on southward and when they were several hundred yards further north they heard a female voice screaming in distress, "Don't touch me", "Leave me alone." They immediately turned around and ran south in the direction of the scream.

-6-

It was too dark to see any activity very far ahead and before they reached the scene they saw the station wagon drive off toward the main gate. At that time they were about 100 yards away and were able to observe that the station wagon was off the road in the grass, near the fence, on the left or wrong side for a vehicle going south. Suspecting a kidnapping they continued on to the gate and gave a full report of what they had witnessed. They accompanied military security personnel on a tour of the residential areas of the Base looking for the station wagon, without success. However, after they returned to their barracks, they were summoned to the security offices where they identified the station wagon. Defendant had been stopped and brought in for questioning as had his wife. Their responses had allayed any suspicion that defendant had been connected with a kidnapping and they were allowed to go home. All of these events occurred before approximately 1:00 a.m., 12 July 1985. The victim's body was found shortly before 6:00 a.m. on that date and defendant was promptly arrested by the military police.

After completing the statement, defendant voluntarily accompanied officers over the route he had taken the night before and to the location of the murder and accurately identified various things, including the tree where he had left the body and where it was found by others and from which the limb he used had been broken.

The pathologist, Dr. James Bell, testified that the cause of death was multiple injuries. He also identified several specific injuries, each of which could have been fatal. The victim had bruises and abrasions over her entire body, front and back. He testified that the injuries to the skull could have been inflicted by the rounded end of defendant's screwdriver that was found near the scene, but not by the pointed end. He identified the tree branch that was inserted into the victim's body. It measured 31 inches in length and had been inserted into the body more than once, to a depth of twenty inches, causing severe internal injuries and hemorrhaging. The pathologist was of the opinion that the victim was alive when the tree limb was inserted into her body. There were also bruises on the victim's neck consistent with strangulation.

*Alley,* 776 S.W.2d at 508-510 (*internal footnote omitted).*

At trial, Petitioner Alley relied upon an insanity defense. *Alley*, 776 S.W.2d at 510. Alley presented the testimony of two psychologists who diagnosed the Petitioner as suffering from a multiple personality disorder. *Id.* However, neither doctor could verify whether an alternate personality was in control at the time of the offense. *Id.* The State's psychologist also examined the Petitioner and determined that psychological tests administered to the Petitioner in May 1986 suggested that he was exaggerating or malingering. *Id.* at 510-511. The State's psychologist further noted that Petitioner had no history of mental health treatment prior to the murder and that it was "improbable that a condition of insanity had taken control of his actions on the evening of the murder." *Id.* at 511. In sum, the State's psychologist, while diagnosing a borderline personality

disorder with a chronic history of drug and alcohol abuse, found no evidence of multiple personality disorder or psychosis. *Id.*

Dr. Craig Lahren, an expert in hair analysis, and Paulette Sims, an expert in forensic serology, also testified at the Petitioner's trial. Dr. Lahren examined a hair collected from inside the victim's shoe. Dr. Lahren determined this hair to be a "Caucasian pubic hair." He stated that "[t]here was nothing unusual or unique about the item, and the sample was too limited to actually do a fair comparison with the – with the known pubic hair." A hair found on the victim's waistband was examined and determined to be a "medium-brown Caucasian body hair, probably from the arm or the leg." Again, there was not "enough consistent microscopic characteristics" to "do a successful comparison on those." Two strands of hair collected from the victim's socks were identified as being from an African-American. Dr. Lahren testified that the presence of these hairs on the victim's socks would be consistent with the victim walking around in her "sock feet." Four hairs found on the victim's shirt were "light-brown Caucasian head hair. They range from two to seven inches in length. . . ." These hairs were determined to belong to the victim. Finally, hair found on the driver's side of the Petitioner's 1972 Mercury station wagon "appeared to be the same as [the victim's] head hair."

Paulette Sims examined blood specimens found at the crime scene. Blood was found on the driver's side door and near the headlight of the Petitioner's vehicle. The blood found on the driver's side door revealed ABO type blood, the same type as the victim. The stain was found to be consistent with bloody hair having been swiped across the surface just above the door handle going downward toward the road. Paulette Sims also examined a bloody napkin found on the floorboard of Petitioner's car. She was not able to determine the species origin for the sample. Similarly, there was blood on a screwdriver found at the scene, but Sims could not identify the source. There was no blood or seminal stains found on the victim's clothing. Blood was found on the Petitioner's shorts, but a blood type could not be determined.

## IV. Satisfying the Statutory Criteria

### A. Existence of Evidence and Prior Testing of Evidence

With regard to the criteria set forth in sections 40-30-304 and 40-30-305, the post-conviction court made the following findings:

> . . . the requested samples are still in existence and have never been subjected to DNA testing. While it appears Sims tested certain items for the presence of blood or seminal fluids, it does not appear any DNA analysis was conducted. The same is true for Lahren. Initially, Lahren explained that hair analysis does not allow an

examiner to say that two "matching" samples are exactly the same; rather, the examiner determines that the two samples share the same microscopic characteristics. Obviously, this does not appear to be as sophisticated a technique as DNA analysis. However, with regard to both Lahren and Sims statements that certain samples were insufficient to allow meaningful comparison, it calls into question whether or not such samples would be sufficient for DNA analysis. Neither the State nor the petitioner can conclusively say that each of the items is in sufficient condition for DNA testing. Nevertheless, since there has not been sufficient proof to contradict the assertion that the samples are sufficient for DNA testing, for purposes of evaluating the statutory criteria, this court will assume said samples are of a sufficient quantity and condition to be tested.

*See* Tenn. Code Ann. §§ 40-30-304(2), (3),-305((2), (3). No reason exists to dispute the post-conviction court's findings.

### B. Reasonable Probability of Different Result

Petitioner Alley asserts that the post-conviction court is to assume that the "DNA analysis will reveal exculpatory results in the court's determination as to whether to order DNA testing." *See Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *5. As this Court has opined, "[t]he Act was created because of the possibility that a person has been wrongfully convicted or sentenced." *Id.* (quotation omitted). Petitioner Alley asserts that he is entitled to DNA analysis regardless of his pre-trial confession. Petitioner Alley relies solely upon this Court's opinion in *Jack Jay Shuttle v. State* in support of his position.

In *Jack Jay Shuttle v. State*, a panel of this Court adopted Judge Tipton's analysis in his concurring opinion in *Ricky Flamingo Brown v. State*, No. M2002-02427-CCA-R3-PC, 2003 WL 21362197, at *2 (Tenn. Crim. App. at Nashville, Jun. 13, 2003), *perm. to appeal denied*, (Tenn. 2003). In *Ricky Flamingo Brown v. State*, Judge Tipton concluded that because "a person may be wrongfully convicted based upon mistaken identity or false testimony," the dismissal of a petition should not be based solely upon the testimony of the victim. *Ricky Flamingo Brown v. State*, No. M2002-02427-CCA-R3-PC, 2003 WL 21362197, at *2. In other words, the fact that the victim identified the petitioner as the perpetrator should not provide the basis for denying testing. *Id.* Applying similar analysis, a panel of this Court held that a pre-trial confession may not provide the sole basis for denying DNA testing.

Jack Jay Shuttle was convicted of first-degree murder and sentenced to life imprisonment. *Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at * 1. Shuttle later filed a petition requesting DNA analysis of the blood found underneath the victim's fingernails and the blood found on his jeans. *Id.* Prior to his conviction, Jack Jay Shuttle admitted that he and the victim got into an argument; she attempted to strike him, but he grabbed her hand and struck her in

the face with his fist. *Id.* The victim came at Shuttle again; this time, he grabbed her by the throat and choked her to death. *Id.* The autopsy report confirmed that the victim died as a result of strangulation. *Id.* At the hearing on DNA analysis, Shuttle asserted that another individual killed the victim, providing both a name and another version of the events leading to the victim's murder. *Id.* at *2. Moreover, Shuttle asserted that he had lied while under oath at both his trial and his post-conviction hearing. *Id.* at *3. Shuttle explained that he only admitted to the murder in order to obtain a conviction for a lesser offense. *Id.* His trial counsel stated that Shuttle had initially maintained that a third party had committed the offense. *Id.* The post-conviction court denied the request for DNA analysis, finding that Shuttle had failed to establish that a reasonable probability existed that he would not have been prosecuted or convicted had exculpatory DNA evidence been obtained. *Id.* Additionally, the court failed to find that Shuttle had established that a reasonable probability existed that he would have received a more favorable verdict or sentence as a result of the DNA evidence. *Id.* A panel of this Court reversed the lower court, applying Judge Tipton's analysis in *Ricky Flamingo Brown* to Shuttle who essentially contended that he was wrongly convicted at trial where he gave false incriminating testimony. *Id. at *5.* In so holding, this Court placed great emphasis on the fact that Shuttle initially informed trial counsel that a third party committed the offense in a manner consistent with his testimony at the post-conviction hearing. *Id.* The Court summarized its holding as follows:

> In summary, for purposes of the Act, we must assume that DNA testing will reveal exculpatory evidence; namely, that the blood underneath the victim's fingernails and the blood on the petitioner's jeans was not the blood of either the victim or the petitioner. In the event DNA testing reveals such findings, the test results would be inconsistent with the state's theory at trial, inconsistent with the petitioner's trial testimony, consistent with the petitioner's first statement to trial counsel, and consistent with the petitioner's latest testimony. Thus, we conclude the petitioner has established a reasonable probability that he would not have been prosecuted or convicted if exculpatory DNA evidence had been obtained.

*Id.* (internal citation omitted).

The present case is distinguishable from the facts in *Jack Jay Shuttle*. Unlike the facts in *Jack Jay Shuttle*, Petitioner Alley has never indicated that his pre-trial confessions were false or that someone other than himself committed the rape and murder of Suzanne Collins. The purpose of the Post-Conviction DNA Analysis Act is to establish the innocence of the petitioner and not to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant. Where the allegation is of recent origin and the evidence otherwise supports the identity of the petitioner as the perpetrator, a prior confession may be sufficient to deny DNA testing. In this regard, we proceed to review the evidence in light of the possible results of DNA testing.

The post-conviction court concluded that Petitioner Alley "failed to demonstrate a reasonable probability that he would not have been prosecuted or convicted if exculpatory DNA evidence had been obtained from any of the requested items." A "reasonable probability" of a different result

exists when the evidence at issue, in this case potentially favorable DNA results, undermines confidence in the outcome of the prosecution. *See, e.g.*, *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). In making this determination, we must consider the "potentially favorable" DNA results along with the existing evidence. A summary of the existing evidence identifying Petitioner Alley as the perpetrator is as follows:

1. Petitioner Alley gave a lengthy and detailed confession, including accompanying law enforcement officials to the scene, where he identified the location where the body was found and the tree from which he obtained the limb used to penetrate the victim.

2. A bloody head hair found on the front driver's side door of Petitioner Alley's car belonged to the victim.

3. Blood on the driver's side door of Petitioner Alley's car was of the same ABO blood type as the victim.

4. Three witnesses identified Petitioner Alley's car, both by sight and sound, as the vehicle used in the abduction.

5. Petitioner Alley has never, prior to the filing of the instant petition, indicated that his statements to law enforcement were false or that someone else committed the rape and murder of Suzanne Collins.

6. Petitioner Alley defended on the ground of insanity, specifically, that he suffered from multiple personality disorder. This theory remained consistent at trial, on direct appeal, and in his post-conviction proceeding.

7. The victim was quartered with other military personnel in a marine barracks, and her body was found in a public park.

8. The jury was informed that numerous hairs were found on the victim's clothing and at the crime scene. The jury was further informed that some of the hairs belonged to the victim, some to neither the victim nor the Petitioner, and some were insufficient to permit microscopic comparison analysis.

9. The State's theory at trial did not involve sexual intercourse, but rather, an act of sexual mutilation with a thirty-one-inch tree limb being inserted into the victim's vagina. This theory was consistent with the Petitioner's statement to law enforcement.

This Court must also consider that the Act only permits "the performance of a DNA analysis which compares the petitioner's DNA samples to DNA samples taken from biological specimens gathered

at the time of the offense." *See Earl David Crawford v. State*, No. E2002-02334-CCA-R3-PC, 2003 WL 21782328, at *3 (Tenn. Crim. App. at Knoxville, Aug. 4, 2003), *perm. to appeal denied*, (Tenn. Dec. 22, 2003). Thus, the Act does not permit DNA analysis to be performed upon a third party. Rather, the results of the DNA testing must stand alone.

### 1. Body Hair Found on Victim's Waistband

A medium brown body hair was found on the waistband of the victim's shorts. Petitioner Alley maintains that, if this hair belongs to someone other than the victim or himself, he would not have been prosecuted or convicted. The post-conviction court found that, although

> DNA analysis may now be able to exclude the defendant and the victim as the source of these hairs, such an outcome would not change the results of the trial, especially in light of the fact that the defendant gave a lengthy and detailed confession, including accompanying law enforcement to the scene where he identified the place where the body was found and the tree in which he extracted the limb used to penetrate the victim.

The court further found that "the hairs found on the [victim's] waistband were not a primary factor in proving petitioner's guilt." We agree. As the post-conviction court found, "the presence of a third party's hair does not preclude an act of violence by the petitioner, in the same way that presence of another's blood would." The Petitioner seeks DNA testing in order to establish that the hair sample belongs to a third party. Such evidence, however, would at best simply establish that a third party had, at some point in time (but not necessarily at the time of the crime) had contact with the victim. *See, e.g.*, *Jacobs v. State*, 115 S.W.3d 108, 113-114 (Tex. App. 2003) (presence of third-party hair on bed linens or clothing not belonging to victim does not necessarily prove petitioner's innocence). The victim lived in a public quarters. It is very conceivable that a third-party's hair was picked up on her clothes or on her person in her everyday routine. Moreover, the hair, even if proven to belong to a third-party, does not negate the remaining evidence which strongly identifies the Petitioner as the perpetrator.

### 2. Pubic Hair in Shoe

Petitioner Alley also seeks DNA testing on a pubic hair found on the victim's left shoe. The post-conviction court, assuming that DNA testing would show that the hair belonged to a third party, refused to find that the Petitioner had established a reasonable probability that he would not have been prosecuted or convicted if exculpatory DNA evidence was obtained from this sample. Again, the State's theory was that an act of sexual mutilation occurred and not the act of sexual intercourse. This theory is consistent with the Petitioner's statement to law enforcement. Again, the evidence would merely show that the victim had encountered a third person at some point. The victim lived in public accomodations, a marine barracks. Finally, this evidence was not a primary factor in proving Petitioner's guilt.

### 3. *Hairs on Bottom of Socks*

Petitioner Alley seeks DNA testing for black hairs found on the bottom of the victim's socks. The State concedes that DNA analysis of the hairs would indicate that the hairs do not belong to the Petitioner. However, as stated above, the victim lived in public accommodations and it is entirely conceivable that the hairs were picked up by the victim walking around in her socks. This evidence was already before the jury. Again, the Petitioner has not established a reasonable probability that he would not have been prosecuted or convicted if DNA testing were to show that the black hairs belonged to a third party.

### 4. *Hair Found on Tree Limb*

Petitioner Alley requests DNA analysis on hair found on the tree limb which was used to rape and kill the victim. The post-conviction court noted that there was no testimony at trial regarding the hair found on the tree limb. Thus, this evidence was not a primary factor in proving the Petitioner's guilt. We cannot disagree with the post-conviction court's conclusion that "even if DNA analysis established that the hair on the limb did not belong to the petitioner or the victim, petitioner has failed to demonstrate that a reasonable probability exists that he would not have been prosecuted or convicted."

### 5. *Nasal, Oral, Rectal, Vaginal, and Inner Thigh Swabs from Victim*

Petitioner Alley also requests DNA analysis to be performed on the nasal, oral, rectal and vaginal swabs taken from the victim and on swabs taken from the victim's inner thighs. The post-conviction court initially questioned the existence of any material available for testing in the swabs. The post-conviction court further found:

> Documents submitted from the chemical and pathology laboratory utilized by the State in analyzing these materials for trial indicates that on some samples there was a "weak positive" indicating the presence of "acid phosphates" or "H substance." The petitioner contends this indicates the presence of semen. However, the State indicates that these substances could be fluids from the victim and do not indicate the presence of semen. Specifically, the State argues that women often have "weak positives" for acid phosphate and further argues that the term "H substance" refers to the blood type O, the same blood type as the victim. Regardless, we find that even if the sample is sufficient for DNA testing, the petitioner has still failed to demonstrate a reasonable probability that he would not have been prosecuted or convicted if testing reveals the presence of another person's bodily fluid on the nasal, oral, rectal, or vaginal areas of the victim or on the victim's inner thighs.

> As the State argues, evidence of another person's semen could merely have been evidence of a prior consensual sexual encounter. Again, this court reiterates that the State's theory at trial was not that the victim was raped by penile penetration.

Rather, the theory was that the victim was essentially sexually mutilated through the insertion of the tree branch into her vagina. Thus, in light of the fact that the petitioner gave a detailed confession to the crime; drove officers, who were unfamiliar with the crime scene, to the location where the body was found and to the place, which was some distance away, where he had broken off the tree limb; the insanity defense asserted by the petitioner at trial and on appeal; the testimony from the three individuals who identified the petitioner's car as the vehicle used in the abduction, both by sight and sound; the fact that victim's bloody hair was found in the [petitioner's] vehicle and her blood; matching her type found on the [petitioner's] door and the medical testimony regarding the insertion of the tree limb into the victim, it simpl[y] is not "reasonable" to conclude that, even if the DNA of the samples revealed semen from another individual present on the victim, the State would not have sought prosecution or the jury would not have convicted the petitioner.

Petitioner Alley apparently relies upon the bare allegation that DNA testing of the above swabs would provide forensic evidence of his innocence. No scientific or medical proof was before the post-conviction court which would have established that the swabs taken from the various areas of the victim's body indicated the presence of semen. Accordingly, we conclude that the post-conviction court has not abused its discretion in finding that the Petitioner had not established a "reasonable probability" that the State would not have sought prosecution or that he would not have been convicted with DNA analysis on the various swabs of the victim's body.

### C. Petitioner's Motivation in Bringing Petition

Finally, the post-conviction court addressed the Petitioner's satisfaction of subsection (4) of sections 40-30-304 and 40-30-305, Tennessee Code Annotated. These provisions provide that the petition for DNA analysis must be brought for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice. Tenn. Code Ann. §§ 40-30-304(4), -305(4). In this regard, the post-conviction court noted:

. . . this court has serious questions regarding the motivations of the petitioner for raising this issue at this time. As previously noted, throughout this order, the petitioner is currently set for execution on June 3, 2004. While it is clear . . . that a petition for post-conviction DNA analysis may be brought at any time, the samples sought for testing by the petitioner have been available since before the trial. Much of the documentation supporting their request was available at trial. Throughout the direct appeal and the post-conviction of this case, petitioner has asserted that he committed the alleged acts, but was not sane at the time of their commission. Thus, the timing of petitioner's allegations is highly suspect.

The post-conviction court noted, however, that Petitioner had otherwise failed to satisfy sections 40-30-304(1) and 40-30-305(1). Thus, the court determined that it need not determine whether the Petitioner had satisfied criteria (4).

Upon our review of the record before us, including the Petitioner's motion and the State's response, we conclude that the post-conviction court properly considered all of the evidence before it. Moreover, we conclude that the record supports the post-conviction court's conclusions that the Petitioner had failed to establish that (1) a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis and (2) a reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceedings leading to the judgment of conviction. *See* Tenn. Code Ann. §§ 40-30-304(1), -305(1). Accordingly, the post-conviction court did not err by denying the Petitioner's request for DNA analysis.

The judgment of the post-conviction court is affirmed.

_____
DAVID G. HAYES, JUDGE