IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2005 Session

## STATE OF TENNESSEE v. GABRIAL AYUEL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-A-345     Seth Norman, Judge**

_____

**No. M2004-02087-CCA-R3-CD - Filed December 5, 2005**

_____

The defendant, Gabrial Ayuel, was convicted by a Davidson County jury of attempted first-degree murder and sentenced to twenty years as a Range I standard offender. On appeal, the defendant raises five issues: (1) juror misconduct; (2) prosecutorial misconduct; (3) erroneous evidentiary rulings; (4) improper disclosure of unrelated, outstanding warrants; and (5) sufficiency of the convicting evidence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Kathleen G. Morris, Nashville, Tennessee, for the appellant, Gabrial Ayuel.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Renee Erb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. FACTS**

The defendant was charged with four counts of aggravated assault and one count of attempted first-degree murder arising out of a shooting at the Sahara Club in Nashville in the early morning hours of September 22, 2001. The defendant was brought to trial on the charges, along with a co-defendant, Madut Magwell.[1] At trial, Officer Johnny Lawrence of the crime scene unit was the first to testify for the State. Officer Lawrence testified as to the placement of three .25 caliber shell

_____

[1] The trial court granted co-defendant Magwell's motion for judgment of acquittal at the end of the State's proof.

casings and two lead projectiles recovered from the scene. A diagram and pictures of the crime scene were also introduced into evidence during his testimony.

One of the victims, Bernard Rogan, a bouncer at the club, was the next to testify. Rogan testified that the night of the shooting was his first night on the job. According to Rogan, the defendant and Magwell arrived with a couple and Magwell proceeded to enter into the club. Rogan heard a commotion at the door, he assumed over Magwell refusing to pay, and he noticed the defendant heading down the sidewalk away from the club. Rogan testified that the defendant returned with a handgun and shot him in the lower chest and left thigh. Rogan recalled that the x-rays revealed a bullet in his chest but no bullet could be found. Rogan also recalled that the bullet in his thigh went "through and through." Rogan said he was hospitalized for two to three months. After being released from the hospital, Rogan went to the police station and identified the defendant as the shooter out of a photographic line-up.

On cross-examination, defense counsel questioned Rogan about inconsistencies in his testimony. Counsel questioned Rogan regarding his testimony at the preliminary hearing. At the hearing, Rogan stated that he had worked at the club for four or five months at the time of the shooting. Also, Rogan's preliminary hearing testimony indicated that he was hospitalized for two to three weeks, but the medical records indicated only three days. On re-direct, Rogan explained that he did not really understand medical records very well. In addition to answering questions on cross-examination regarding inconsistencies, Rogan testified that he did not punch or push the defendant prior to the shooting.

Another victim, Peter Langoya, whose family owned the club, testified that the defendant had previously been told he was banned from the club. Langoya stated that he told Rogan to watch for the defendant. Langoya testified that he heard shouting at the door, saw the defendant shoot, but did not see Rogan get shot. Langoya stated that he was hit in the leg by a bullet fired from the defendant's gun. According to Langoya, the defendant ran inside the club shooting; however, defense counsel pointed out that at the preliminary hearing Langoya testified that the defendant never entered the building. On cross-examination, Langoya denied that he initially told the police that the shooter had light skin and a gap in his front teeth.

Franco O'Kello testified that he saw Rogan stop Magwell from entering the club. He then saw the defendant run to a car, walk back towards the club entrance, and start shooting. According to O'Kello, after the shooting the defendant left in a Nissan Maxima. O'Kello testified that he identified the defendant as the shooter from a photographic line-up.

Pasto Odwar, disc jockey and bartender at the club, testified that he was in the outside parking lot at the time of the shooting. Odwar noticed that the defendant was involved in an argument at the front door; after which, the defendant ran to a car and returned shooting. Odwar testified he could not see what the defendant retrieved from the car, but noticed that the defendant looked suspicious when he returned to the club's entrance. On cross-examination, Odwar stated that he first saw Stacy Johns escort the defendant down the sidewalk, then saw the defendant go to a car

and return to the club. When counsel questioned Odwar about the shooter leaving in a green Mitsubishi, Odwar stated that everything happened so fast that he was not sure which car the shooter left in.

Stacy Johns, disc jockey and security at the club, testified that he was in the DJ booth when he was called to go to the front door because Rogan was having a problem with the defendant. Johns said that Rogan was in a stance to "swipe" at the defendant so he told Rogan to go back in the club and he escorted the defendant down the sidewalk. According to Johns, he thought the defendant had calmed down so he turned to go back to the club. However, to Johns surprise, the defendant ran by him, knocking him off balance. Johns saw the defendant pull a gun out of his pocket and heard shots. When questioned on cross-examination, Johns denied telling an investigator that Rogan actually hit Magwell and the defendant.

Homicide Detective Johnny Crumby testified about the police procedure for conducting photographic line-ups. Detective Crumby explained that Rogan, Langoya, O'Kello, and Odwar all identified the defendant as the shooter from an array of six individuals. On cross-examination, Detective Crumby admitted that he did not interview the defendant and volunteered that the defendant was arrested on an outstanding warrant unrelated to this case.

At the close of the State's proof, the court dismissed two counts of aggravated assault brought against the defendant upon the State's request. Also, the trial court ordered the defendant's acquittal on count three, the aggravated assault of Stacy Johns. However, the trial court allowed the jury to consider the remaining counts of aggravated assault of Langoya and attempted first-degree murder of Rogan.

Former co-defendant, Madut Magwell, testified that as he was leaving the club, he saw the defendant in a line outside waiting to enter. Magwell said that he saw the defendant talking with a security guard, then he saw the security guard push the defendant. According to Magwell, after the guard pushed the defendant, the defendant pulled a gun out and shot the security guard. On cross-examination, Magwell denied knowing the defendant prior to the shooting.

The defendant testified on his own behalf. According to the defendant, he was walking towards the club entrance when he overheard Magwell asking for his money back. When he asked "what's going on," Rogan jumped up and pushed him away, making him fall. The defendant recalled that he told Rogan not to push him anymore. The defendant stated that he was talking to Stacy Johns outside when Rogan hit him in the face. Rogan then tried to jump down on him, so he pulled the gun out of his pocket and shot him.

The defendant testified that he had the gun in his pocket the entire time and he never went back to the car. The defendant explained that he was scared when Rogan pushed and hit him because one of his cousins was killed in a similar manner. He said that he carried a gun because he lived in the "projects" and was afraid of getting jumped. The defendant testified that he threw the gun away after the shooting and that he did not mean to shoot Langoya. On cross-examination, the

-3-

defendant said that he did not try to sell a gun to Mr. Bassilis. The prosecutor also questioned the defendant about whether he was banned from the club for causing trouble, to which the defendant answered he had never been told he was not allowed in the club.

The State called John Bassilis as a rebuttal witness. Bassilis testified that the defendant was not the one who tried to sell him a gun but was with the person who tried to sell it. However, Bassilis said he heard the defendant say "I am the one who shoot." The prosecutor also asked Bassilis if he told a police officer that the defendant admitted shooting the gun, to which Bassilis replied "[t]his is what I'm saying now."

Detective Crumby was also called as a rebuttal witness for the State. Detective Crumby testified that when he interviewed Magwell, Magwell never mentioned that he witnessed a fight between the security guard and the defendant. Detective Crumby further stated that Magwell claimed to know nothing about the shooting.

Following the proof and closing arguments, the jury found the defendant not guilty of the aggravated assault of Peter Langoya but guilty of the attempted first-degree murder of Bernard Rogan. The defendant filed a motion for a new trial, which the trial court denied. The defendant appealed.

## II.  ANALYSIS

On appeal, the defendant raises five errors. Specifically, he alleges that: (1) juror misconduct tainted the verdict; (2) prosecutorial misconduct denied him of his right to a fair trial; (3) the trial court made erroneous evidentiary rulings; (4) the State improperly disclosed that he was arrested on an outstanding unrelated warrant, denying him his right to a fair trial; and (5) the evidence was insufficient to support a conviction of attempted first-degree murder.

### JUROR MISCONDUCT

The defendant's first issue is that juror misconduct tainted the verdict, denying him the right to a fair trial. The defendant alleges misconduct on the part of Steven Sloan, who ultimately served as jury foreman. The defendant submits that during *voir dire* all jurors were asked whether they adhered to the legal principle of innocent until proven guilty beyond a reasonable doubt. Sloan indicated that he subscribed to this principle. However, Patricia Snyder, a criminal defense attorney and member of the jury pool, revealed after the trial that Sloan commented to her during a break during *voir dire* "that the police do not arrest innocent people and that "the defendant in this case must be guilty because he had been arrested."

The trial court heard testimony from both Sloan and Snyder at a hearing on the defendant's motion for a new trial. Sloan testified that he never said that the police do not arrest innocent people and that he listened to all the evidence before reaching a verdict of guilt. Sloan elaborated that his conversation with Snyder centered on his opinion that it would be difficult to *defend* someone he

believed was guilty. Sloan testified that he answered all *voir dire* questions truthfully and was a fair juror in deciding the case. Following the hearing, the trial court commented that:

> Mr. Sloan has been as candid as any witness I've ever seen in this case. I personally have a feeling that the police do not arrest innocent people, but that doesn't mean that I don't listen to the proof and I'm not going to make a decision on the matter until I have heard the proof, and that is exactly what this gentleman said he did. . . . I have that opinion, so what? I listen to the proof and that is exactly what Mr. Sloan said he did.

Initially, we note that the trial court's findings regarding a juror's impartiality are entitled to a presumption of correctness because these findings involve a determination of a juror's demeanor and credibility. State v. Smith, 993 S.W.2d 6, 29 (Tenn. 1999); State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989). Therefore, the burden rests on the defendant to establish by clear and convincing evidence that the trial court's determinations were erroneous. Id. The formation of an opinion will not disqualify a juror if he can lay aside his opinion and render a verdict based on the evidence presented in court. See State v. Sammons, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982); Tenn. R. Crim. P. 24, Advisory Commission Comments. There is, however, a presumption of prejudice if a juror willfully conceals or fails to disclose information on *voir dire* which reflects on the juror's lack of impartiality. State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993).

After our review of the record, we find no indication that Sloan concealed any information reflecting a possible bias or partiality so as to raise the presumption in Akins. We are of the view that the defendant has not proven juror misconduct. Sloan indicated that he could follow the law as applied to the present case. After observing Sloan's demeanor at the defendant's motion for new trial, the trial court accredited his testimony in every respect. The determination of impartiality rests within the trial court's discretion, and the record reflects no abuse of that discretion in the trial court's finding that Sloan was a fair juror. Accordingly, the issue is without merit.

## PROSECUTORIAL MISCONDUCT

Next, the defendant alleges three instances of prosecutorial misconduct, depriving him of a fair trial. The defendant argues that the prosecutor elicited false testimony from Rogan, misstated evidence during closing argument, and withheld Brady material so the defense could not use it effectively during trial.

### False Testimony and Closing Argument

The defendant argues that the prosecutor encouraged false testimony from Bernard Rogan regarding the length of his hospital stay and the extent of his injuries. The defendant also argues that the prosecutor misstated the evidence by saying that a bullet remained lodged in Rogan's chest and that John Bassilis said the defendant tried to sell him a handgun shortly after the incident at the club.

To begin, we note that "[i]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). In determining whether statements made by the prosecutor constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). We are guided by such factors as the intent of the prosecutor in light of the facts and circumstances of the case, the strength or weakness of the evidence, the curative measures, if any, undertaken by the trial court in response to the conduct, and the cumulative effect of the conduct. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Our supreme court has observed that "argument of counsel is a valuable privilege that should not be unduly restricted. Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Our courts seek to give great latitude to counsel in expressing their views of the case to the jury." Id. at 739; see also State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). The action of a trial judge in controlling arguments of counsel will not be reversed absent an abuse of discretion. Smith, 527 S.W.2d at 739.

The defendant points to two occurrences where the prosecutor allegedly elicited false testimony from Rogan. First, the medical records offered into evidence by the State indicated that Rogan spent three to four days in the hospital. However, on direct examination Rogan testified that he spent two or three months in the hospital. Defense counsel questioned Rogan about the inconsistency on cross-examination. On re-direct examination, the prosecutor asked Rogan whether he understood medical records very well and if he knew whether discharge meant from the unit, hospital or the doctor. Second, the medical records also indicated that Rogan had two bullet wounds on his left thigh and one wound on his chest. When X-rays did not reveal a bullet in Rogan's chest, the doctor performed an exploratory surgery but found no bullet. However, Rogan testified on direct examination that a bullet remained in his chest.

After our review of the trial transcript, we conclude that the prosecutor's line of questioning was not improper. The defendant was given the opportunity to cross-examine Rogan on the discrepancies between his testimony and the medical records. Thereafter, the credibility determination was for the jury. The prosecutor's questioning on re-direct appears to be aimed at pointing out that Rogan did not understand medical records, not foster false testimony. Furthermore, the defendant supports his contention that prosecutorial misconduct deprived him of a fair trial by arguing the State cannot knowingly use false testimony to convict an accused. However, the defendant has failed to show, and we fail to see, how Rogan's confusion or exaggeration over how long he was hospitalized served to deprive the defendant of a fair trial. If anything, Rogan's confusion or exaggeration likely helped the defense discredit his testimony.

Next, the defendant argues that the prosecutor engaged in two instances of misconduct during closing argument. The defendant first takes issue with a statement in the prosecutor's rebuttal argument asserting that Rogan was shot more than once. The prosecutor's statement is as follows:

Prosecutor: There is [sic] three casings lying on the ground. Two bullets went through and through. One through [Bernard Rogan's] leg and one through Peter Langoya's leg. Where is the other bullet, it's inside of Bernard Rogan.

Following our review, we conclude the prosecutor's statement was improper because of the evidence in Rogan's medical records that the doctor did not find a bullet in Rogan's chest. Although improper, the error was harmless in that it did not effect the outcome of the trial in light of the other overwhelming evidence against the defendant. The prosecutor's statement was single and isolated, and we do not see how the error prejudiced the defendant or infected the trial with unfairness. Furthermore, we note that the defendant did not object to this statement. It is well settled that without a contemporaneous objection to a prosecutor's statement, the error is waived. State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996); State v. Sutton, 562 S.W.2d 820, 825 (Tenn. 1978). Accordingly, this issue is without merit.

The next portion of the prosecutor's closing argument the defendant alleges is erroneous is as follows:

Prosecutor: Now, caught in a very simple, simple misstatement, and I used the word misstatement generously, just plain not telling the truth that he threw that gun away and then that guy, Mr. Bassilis comes in here and testifies, trying to get rid of it . . .

Defense Counsel: Objection, Your Honor. I normally don't object in an argument, but that's not what that witness said.

Court: Overruled. That's a question for the jury.

Prosecutor: You will have to decide what he [Mr. Bassilis] said, but I thought that's what he said. . . .

After our review of the record and the applicable law, we conclude the prosecutor's remarks were within the great latitude given to counsel during closing argument. Argument of counsel is a valuable privilege controlled by the discretion of the trial court. The trial court commented that interpreting Bassilis' testimony was for the jury and it was not an abuse of discretion for the trial court to give *both* parties full opportunity to argue their respective interpretations of the evidence. Accordingly, this issue is without merit.

**Brady Material**

The defendant also alleges that the prosecutor delayed in producing a statement by Peter Langoya that the shooter was a light-skinned man and a statement by Pasto Odwar that the shooter came from a green Mitsubishi with chrome rims when other evidence indicated the defendant was in a red car.

We begin our review by setting out the elements in Tennessee necessary to make a successful due process claim under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The defendant must establish that he requested the information, the State withheld the information, and the withheld information was both favorable and material to the defense. <u>State v. Edgin</u>, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant has the burden of proving a constitutional violation by a preponderance of the evidence. <u>State v. Spurlock</u>, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993).

The defendant insists that the State should have furnished the statements, characterized by him as Brady material, prior to trial. In sum, the defendant argues the statements were both material and exculpatory and had they been provided earlier, he could have been more effective in cross-examining Langoya and Odwar.

It is our view that the statements in question are not Brady material for two reasons. First, the statements are not exculpatory. Several eyewitnesses identified the defendant as the shooter in photographic line-ups and the defendant admitted that he was the shooter but sought to justify the shooting under a theory of self-defense. Thus, any statements regarding vehicle or shooter description do not exculpate the defendant in light of the defendant's own admission and the testimony of several other witnesses. Second, the statements are not material. The materiality of the evidence focuses on the issue of guilt or innocence rather than on the defendant's ability to prepare for trial. <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 112 n. 20 (1976). The statements are not material because they bear no relevancy to the defendant's innocence, but rather would have at most aided the defendant in cross-examination. Accordingly, this issue is without merit.

**EVIDENTIARY RULINGS**

The defendant next argues that the trial court made erroneous evidentiary rulings regarding his "prior bad acts." Specifically, the defendant argues that the trial court erred by: (1) delaying its ruling on his motion in limine to exclude mention of his prior bad acts, thereby allowing reference to guns in clubs during *voir dire*, and (2) allowing the prosecutor to question him on cross-examination about his being banned from the club for carrying a gun without ruling on the materiality or relevancy of the evidence.

In Tennessee, evidence that a criminal defendant has committed some other crime or bad act independent of that for which he is charged is generally inadmissible. Tenn. R. Evid. 404(b); <u>State v. Howell</u>, 868 S.W.2d 238, 254 (Tenn. 1993). However, if evidence that a defendant has committed an act separate and apart from the one for which the defendant is on trial is relevant to some material matter at issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. Tenn. R. Evid. 404(b); <u>Howell</u>, 868 S.W.2d at 254. Furthermore, because of the risk of unfair prejudice to the defendant, Rule 404(b) establishes special procedures which must be followed before evidence of prior bad acts may be admitted. <u>See</u> Tenn. R. Evid. 404(b), Advisory Committee Comments. If the trial court determines the evidence is admissible, it must, upon request, state on the record the material issue to which the evidence is relevant and the court's reasons for admitting the evidence. <u>Id.</u> at 404(b)(2). When a trial court

substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Additionally, cross-examining a defendant about specific instances of conduct when the defense opens the door to character evidence has been allowed. See, e.g., State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); State v. Patton, 593 S.W.2d 913 (Tenn. 1979).

First, the defendant argues that the trial court erred by delaying its ruling on his "prior bad act" motion in limine until right before Langoya's testimony. Before Langoya testified, the trial court held a jury-out 404(b) hearing to determine whether it would allow testimony concerning the defendant being banned from the club for causing trouble and bringing in guns. The trial court noted "from what I've heard [Langoya] say, I will allow you to ask him if [the defendant was] allowed in the club and he can . . . answer no, and that's as far as I'll allow you to go with regard to his testimony."

It is the defendant's position that the State was able to present the allegation that he had been banned from the club for carrying a gun during *voir dire* because of the trial court's delayed ruling. The defendant claims that these allegations were presented in the following fashion:

> Prosecutor: So what if a club owner says we don't like guns [in] our club or our bar, we ask people not to bring guns in there, do you think that's reasonable?
>      . . . .
> Prosecutor: So of course the bar owner is being reasonable saying we don't want weapons in here, you're not allowed to have them and also we don't want them?

From the indictments alone, the potential jurors could tell the case involved a handgun in a club. Accordingly, a fair reading of the transcript is that the prosecutor's inquiries were modeled after this particular night in question, not some previous occurrence. After our thorough review of the *voir dire* transcript, we fail to see any impropriety in the prosecutor's questioning. This issue is without merit.

Second, the defendant argues that it was erroneous for the trial court to not follow the procedures set out in Tennessee Rule of Evidence 404(b) when it allowed the prosecutor to ask Langoya on cross-examination about the defendant's prior bad acts. On cross-examination, the defendant testified that he had never been told he was not allowed in the club. After which, the prosecutor asked the court for permission to cross-examine the defendant about being banned from the club for having a gun and sought to have Langoya brought back in case the defendant denied it. Defense counsel interjected that "Mr. Langoya has already testified and I don't think that would be in rebuttal."

We are of the view that there are two reasons the trial court did not err in allowing cross-examination of the defendant about his denying that he was banned from the club. First, the defendant failed to make a contemporaneous objection to the State's request to cross-examine him thus waiving the issue. See Tenn. R. App. P. 36(a). Defense counsel's interjection focused on re-

calling Langoya as a rebuttal witness, not on the propriety of the State's right to cross-examine the defendant. Second, even if the defendant had objected, he failed to request a second jury-out hearing. The trial court had already conducted a hearing as required by Rule 404(b) and had properly limited the admissibility of the evidence. See Tenn. R. Evid. 404(b). The defendant is seemingly claiming that the trial court should have had *another* jury-out hearing and made another finding as to the relevancy of the evidence, but he did not offer any support in his brief for the proposition that the court should have *sua sponte* held this second hearing. The defendant opened the door to cross-examination of his prior bad acts when he repeatedly denied being told he was not allowed in the club; therefore he is not entitled to relief on this issue.

## UNRELATED ARRESTS

Next, the defendant argues that the State improperly disclosed he was arrested on an outstanding warrant unrelated to the charges in this case. The disclosure occurred during the defendant's cross-examination of Officer Johnny Crumby. The colloquy is as follows:

Defense Counsel: Did you interview [the defendant]?

Witness: No, ma'am, I did not. He was arrested on outstanding warrants charged with an unrelated violation unrelated to this case and he did not make a statement to me.

Defense Counsel: Okay. Thank you.

We note, the defendant failed to object or ask the court to strike Officer Crumby's answer and has therefore waived the issue on appeal. See Tenn. R. App. P. 36(a). However, the defendant argues that we should determine the disclosure constitutes plain error. There are five factors which must be present for a court to determine "plain error" exists:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (citing Adkisson, 899 S.W.2d at 641-42). Complete consideration of all five factors is unnecessary if at least one is absent. Id. at 283. Furthermore, the plain error must be such that it probably changed the outcome of the trial. Adkisson, 899 S.W.2d at 642.

In his brief, the defendant failed to articulate exactly how Officer Crumby's statement amounts to plain error. The defendant's entire plain error argument consists of "[a]pplying each factor to [the defendant's] case, this Court should find each element met. . . ." We fail to see how Officer Crumby's unresponsive answer amounts to plain error. In our view, the only factor

-10-

applicable to the defendant's argument is that the record established what occurred at trial. Therefore the issue is without merit.

## SUFFICIENCY OF THE EVIDENCE

Finally, the defendant challenges the sufficiency of the convicting evidence. Specifically, he argues that the State failed to prove the element of premeditation. Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Carruthers, 35 S.W.3d at 558; Tuggle, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002); Bland, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. See State v. Elkins, 102 S.W.3d 581, 582 (Tenn. 2003); Reid, 91 S.W.3d at 277.

A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion in order to be premeditated. Id. An intentional act requires that the person have the desire to engage in the conduct. Id. § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the murder. Bland, 958 S.W.2d at 660; State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). In particular, the use of a deadly weapon upon an unarmed victim is evidence of premeditation. See Bland, 958 S.W.2d at 660.

After considering the evidence in the light most favorable to the State, we conclude that a rational jury could have found the defendant guilty of attempted first-degree murder. To sustain the defendant's conviction, the State was required to prove that the defendant intentionally and after the exercise of reflection and judgment attempted to kill Bernard Rogan. See Tenn. Code Ann. §§ 39-12-101, 39-13-202. At trial, the evidence established that after getting into an altercation with Rogan at the entrance to the club, the defendant walked away and retrieved a gun from the car, hid it in his pocket, walked back to the club entrance and shot Rogan at point-blank range. The record is undisputed that Rogan was unarmed and, other than the defendant's testimony, there is no evidence

that Rogan threatened or intimidated the defendant. We are aware that there was some conflicting testimony at trial, but assessing the credibility of witnesses is the sole province of the jury. Accordingly, we conclude the evidence supports all the necessary elements for the defendant's attempted first-degree murder conviction.

### III. CONCLUSION

After our review of the record and the parties briefs, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE