# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 2, 2011 Session

## STATE OF TENNESSEE v. HENRY LEE JONES

**Direct Appeal from the Criminal Court for Shelby County**
No. 03-06997     John P. Colton, Jr., Judge

No. W2009-01655-CCA-R3-DD  - Filed April 18, 2013

CAMILLE R. MCMULLEN, J., concurring in part and dissenting in part.

I respectfully dissent from the portion of the majority opinion in this case concluding that the trial court properly admitted the murder of Carlos Perez (the Florida murder) pursuant to Rule 404(b) of the Tennessee Rules of Evidence. In my view, the State failed to show that the method used in these murders was so unique as to constitute a signature that would give rise to the inference of identity. Based on the following authority and analysis, I would have concluded that the admission of the Florida murder was unfairly prejudicial and reversed the judgment of conviction and remanded for a new trial.

"A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, 'the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule.'" State v. Marcos Enrique Collazo, Sr., No. M2009-02319-CCA-R3-CD, 2011 WL 4529643, at *14 (Tenn. Crim. App. Sept. 29, 2011), perm. app. denied (Tenn. Feb. 16, 2012) (quoting State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). Because the trial court held the requisite hearings, considering the necessary factors, it substantially complied with the procedures of Rule 404(b), and its decision is reviewed for an abuse of discretion. "An abuse of discretion only occurs if the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Jerry Kirkpatrick, No. E2011-01091-CCA-R3-CD, 2013 WL 105896, at *8 (Tenn. Crim. App. Jan. 6, 2013) (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

It has long been settled that "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character." State v. Shropshire, 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). "Such exceptional cases include identity, intent,

motive, opportunity, or rebuttal of mistake or accident." Id. "When evidence that the defendant committed another crime is offered to prove his identity as the perpetrator of the crime on trial, the modus operandi of the other crime and of the crime on trial must be substantially identical and must be so unique that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged." Bunch v. State, 605 S.W.2d 227, 230 (Tenn. 1980) (emphasis added). As explained in Bunch,

> The probative value of evidence of other crimes where the issue is identity depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense in issue. Both the existence and the strength of an inference proceeds through an evaluation of the similarities between the prior offense and the charged crime. Thus, if the characteristics of both the prior offense and the charged offense are not in any way distinctive, but are similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offense and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense also committed the offense on trial. . . . The probative value of evidence of other crimes on the issue of identity always depends upon the strength of the inference; when the inference of identity is weak, evidence of prior crimes should be excluded because under such circumstances the prejudicial effect of the evidence inevitably outweighs the probative value of that evidence.

Id. at 230 (quoting United States v. Powell, 587 F.2d 443, 448 (9th Cir. 1978)). "To be relevant and, therefore, admissible, it is not necessary that the other crime be identical in every detail to the offense on trial; it is sufficient if evidence of the other crime supports the inference that the perpetrator of it, shown to be the defendant, is the same person who committed the offense on trial." Id. at 231 (affirming admission of evidence to prove identity). However, "[o]nly when the method used to commit the crimes is so unique as to be like a signature can the inference of identity properly arise." State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999). "To determine whether certain crimes are substantially identical and permit an inference of identity, 'the test is not whether there was evidence that a defendant committed both crimes, but whether there was a unique method used in committing the

2

crimes.'" State v. Derrick Sloan Taylor, No. M2010-00571-CCA-R3-CD, 2011 WL 2418911, at *23 (Tenn. Crim. App. June 10, 2011) (quoting Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)), perm. app. denied (Tenn. Sept. 21, 2011); accord Shirley, 6 S.W.3d at 250.

"[B]efore evidence of another crime may be admitted to identify the accused as the perpetrator of the crime charged, there must be some similarity and uniqueness of the plan or method common to the two (2) offenses." State v. Bobo, 724 S.W.2d 760, 764 (Tenn. Crim. App. 1981). Significantly,

> [T]he proof depended on to show that the two crimes were committed by the same person must establish some peculiarity of plan or method common to the two offenses, otherwise evidence showing the defendant guilty of the collateral crime could do no more than indicate an evil propensity. Such propensity is not considered relevant to identify and the probable prejudicial effect of such evidence lies at the root of the rule excluding it.

Id. at 764 (quoting Harris v. State, 227 S.W.2d 8, 10-11 (Tenn. 1950)). The Tennessee Supreme Court best explained this exception and stated, "[i]t may be . . . that a particular stratagem or method has such unusual particularities that reasonable men can consider that it would not likely be employed by different persons. Many men commit murder, but Jack the Ripper used his knife in a manner so peculiar that when his crimes were viewed together there could be little doubt that they were committed by the same man. Merely the fact, however, that a series of such crimes may be committed with a knife will not render them unusual enough to identify the perpetrator of one as the perpetrator of the others." Harris, 227 S.W.2d at 11 (citing Wrather v. State, 169 S.W.2d 854 (Tenn. 1943)).

In this case, the State does not specifically point to anything unique or distinctive about murders in order to establish the Defendant's identity. Instead, the State insists that the Defendant's identity was established based on his modus operandi, which included the following similarities: the victims were bound, strangled, suffered multiple incised wounds to the throat, had bindings removed from their bodies, two of their bodies were left face down, items of value were taken, and the crime scenes were wiped cleaned.

As an initial matter, the record in this case shows the following material differences in these murders. The charged offense, the Tennessee murders, occurred in a suburban home and involved two elderly victims. It was perpetrated by two individuals, an accomplice, Young, and the Defendant. The uncharged offense, the Florida murder, occurred at a motel located in a high crime area and involved a young male victim and another unidentified female. The Florida murder also involved evidence of a sexual assault, while the Tennessee

3

murders did not.

Specifically, the Tennessee medical examiner testified that both of the victims in the instant case died as a result of multiple injuries. Mr. James suffered incised wounds to the neck, a stab wound to his neck, a broken hyoid bone, blunt force injuries to his chest, fractured parts of the front neck bone, and rib fractures. There was also evidence suggesting that (1) his wounds were inflicted after he was killed, (2) possible strangulation, and (3) ligatures or bindings on his extremities. Mr. James's body was found "in repose on his right side." In regard to Ms. James, the medical examiner testified that she suffered multiple incised wounds to the neck, incised wounds to forearms, and possible strangulation. Asked whether the linear marks on her neck were caused by manual or ligature strangulation, the medical examiner said, "it may [have been] some hard object that was used around the neck, an object could be held against the neck with enough force to compress the neck and leave the marks on the neck." However, other than a "cut," he found no evidence of bondage, and her hyoid bone was intact. Although Ms. James's body was found face down, the medical examiner opined that her body had been moved "in a position other than that in which she was found at the time that the neck wounds were produced."

The medical examiner was asked directly whether "throat cutting" was an unusual method of homicide, and he replied, "No." In addition, the medical examiner noted that the Tennessee crime scene was unusual because it was a double homicide, the victims were found in different areas of the home, and the home was "very neat and well-kept." He further agreed that while the "victimology" in this case was "rare," throat cutting, bondage, asphyxiation by possible strangulation, or any combination thereof had become a common method of homicide. He stated that multiple incisions as in the instant case were not uncommon because they are committed with a non-surgical instrument. He described such killings as "inefficient" because multiple incisions with the cutting edge of the instrument was necessary to penetrate the skin and ultimately gain access to deeper tissue within the body.

On re-direct examination, the medical examiner agreed that "knife wounds . . . [were] a minority of the homicides in Shelby County" and that there were fewer cases involving victims who were killed with incisions, bound, strangled, and had bindings removed. He had no data on the frequency of bodies being left face up or face down. He also said it is "becoming even increasingly more frequent" for the perpetrator to clean up the crime scene.

The victim in the Florida murder was found in a motel "laying [sic] across the bed with his head pointing south. He was covered. His body was covered with a bed comforter and there was also a pillow over his head area." Florida law enforcement had conducted various tests on the evidence collected from the crime scene, and "none of the specimens

4

came back matching [the Defendant][.]" To the contrary, a stain on the comforter or mattress top matched another individual who was eliminated as a suspect, and the DNA from cigarette butts matched the victim and an unknown female. Additionally, female DNA was recovered from the victim's body.

The Florida medical examiner testified that there were ligature marks on the victim's neck, wrists, and ankles and residue from tape on both wrists. There were also seven to eight cuts to the victim's neck, with a one-to-two-inch deep "gap" "almost seven to twelve inches in length." The medical examiner said "the very remarkable thing is a very deep incised wound through the neck." He also found "fresh abrasions about quarter inch size . . . on the walls of the anal aperture," and determined the cause of death was "ligature strangulation and incised wounds of neck."

On cross-examination, the medical examiner said the victim's body was found nude and face down. He described the ligature marks, or "furrows," on the neck, ankles, and wrists as "not very deep," and "regular and then homogenous." He explained the "width or the thickness or the band-like configuration" was regular and "[a]pproximately . . . a quarter inch." He also found fifteen to twenty milliliters of a grayish-mucoid substance inside the anal canal of the victim. He discussed a "deep incision to the neck," noted the left side of the neck showed "clear the strangulation or abrasion of the strangulation," and found what was consistent with a "bite mark" on the victim's back.

Interestingly, the Florida medical examiner opined that ligature strangulation does not result in breaking the hyoid bone; however, manual strangulation usually does. He testified that the victim's "hyoid bone and larynx . . . [were] grossly intact." He explained "in the larynx, there are the horns, that small projection, usually with the manual strangulation, they are fractured, so those were not there. . . . But there is obvious cut between the thyroid cartilage and the cricoid cartilage where the circumference is about three-fourth of its entire circumference."

In concluding that the similarities of the murders were "unique enough to establish a signature modus operandi," the trial court relied heavily upon the testimony of the Tennessee medical examiner. Specifically, the trial court noted that "death as a result of knife wounds would comprise a minority of homicides and even fewer cases have both incised wounds to the neck and strangulation." The trial court appeared to focus on how frequent knife crimes were committed in Shelby County rather than the unique or distinct nature of the Tennessee and Florida murders. As one court has commented, "[r]arity, by itself, is not to be equated with distinctiveness. If there were an abnormal year with only two murders by gunshot, . . . could we conclude that a gunshot is a signature for that year and therefore conclude that the same person did both [crimes]?" State v. Johnson, 832 P.2d 443, 449 n.11 (Or. 1992). Certainly, the answer to that question would be no.

5

While these tragic killings indeed bear some similarities, the record fails to show how they are unique or distinct from any other killing. Moreover, based on the above proof, nothing about how these crimes were committed demonstrate that they were perpetrated by the same person. In my view, the methodology of these murders was far too common to rise to the level of a signature crime. The inference of identity relied upon by the State simply did not exist; therefore, the Florida murder should have been excluded under our rules. Accordingly, I would conclude that the trial court abused its discretion in admitting the Florida murder. Because I am unable to conclude that the erroneous admission of the Florida murder did not effect the outcome of the verdict, I would reverse the judgment of conviction and remand for a new trial.

_____

CAMILLE R. McMULLEN, JUDGE